# In the
# United States Court of Appeals
## for the Seventh Circuit

SPORTFUEL, INC.,

*Plaintiff-Appellant,*

v.

PEPSICO, INC., et al.,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:16-cv-07868.
The Honorable **Matthew F. Kennelly**, Judge Presiding.

## BRIEF OF DEFENDANTS-APPELLEES
## PEPSICO, INC and THE GATORADE COMPANY

FLOYD A. MANDELL
JULIA L. MAZUR
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois 60661-3693
Telephone: (312) 902-5200

*Counsel for Appellees*


COUNSEL PRESS · (866) 703-9373

PRINTED ON RECYCLED PAPER


**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-3010

Short Caption: SportFuel, Inc. v. PepsiCo, Inc., et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[   ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

PepsiCo, Inc.

The Gatorade Company


(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Katten Muchin Rosenman LLP


(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

The Gatorade Company is a wholly-owned indirect subsidiary of PepsiCo, and PepsiCo is a publicly held corp

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature:  s/ Floyd A. Mandell                    Date: 2/20/19

Attorney's Printed Name:  Floyd A. Mandell

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** X    **No** _____

Address:  Katten Muchin Rosenman LLP, 525 West Monroe Street, Chicago, Illinois 60661-3693


Phone Number:  (312) 902-5235                 Fax Number:  (312) 577-8982

E-Mail Address:  floyd.mandell@kattenlaw.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-3010

Short Caption: SportFuel, Inc. v. PepsiCo, Inc., et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[  ]      PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

PepsiCo, Inc.

The Gatorade Company

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Katten Muchin Rosenman LLP

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

The Gatorade Company is a wholly-owned indirect subsidiary of PepsiCo, and PepsiCo is a publicly held corporation

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature:  s/  Julia L. Mazur                                    Date:  1/4/19

Attorney's Printed Name:  Julia L. Mazur

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** _____    **No**  X

Address:  Katten Muchin Rosenman LLP, 525 West Monroe Street, Chicago, Illinois 60661-3693

Phone Number:  (312) 902-5280                    Fax Number:  (312) 902-1061

E-Mail Address:  julia.mazur@kattenlaw.com

rev. 01/15 GA

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENTS ...................................................................... i

COUNTER STATEMENT OF JURISDICTION ....................................... 1

COUNTER STATEMENT OF THE ISSUES ON APPEAL........................ 1

COUNTER STATEMENT OF THE CASE ................................................. 2

   1. Gatorade ......................................................................................... 2

     a. Gatorade's Use of "Gatorade The Sports Fuel Company" ........... 2

     b. Gatorade's Sales and Marketing Channels .................................. 4

   2. Third-Party Use of "SportFuel," "Sports Fuel," and "Fuel"............. 5

   3. SportFuel............................................................................................ 6

     a. SportFuel's Use of Its Mark ........................................................ 6

     b. SportFuel's Sales and Marketing Channels................................. 7

     c. SportFuel Admitted It Has No Evidence of Actual Confusion, an Intent to Harm, or Damage Suffered ......................................... 8

   4. The District Court Granted Summary Judgment for Gatorade ...... 9

SUMMARY OF ARGUMENT .................................................................... 9

STATEMENT OF THE STANDARD OF REVIEW ............................... 11

ARGUMENT ............................................................................................ 12

   1. The District Court Correctly Ruled That Gatorade Was Entitled to Summary Judgment on Its Fair Use Defense ............................... 12

     a. "Sports Fuel" Describes Gatorade's Products.............................. 13

     b. Gatorade Does Not Use "Sports Fuel" as a Trademark ............... 16

       i. The Undisputed Evidence Shows "Sports Fuel"........................ 16
Is Used Descriptively .................................................................. 16

       ii. Gatorade Disclaimed Exclusive Rights to "The Sports Fuel Company".................................................................................... 22

       iii. The Fair Use Defense Applies to Descriptive Terms ................ 23

     c. Gatorade Uses "Sports Fuel" Fairly and in Good Faith ............. 25

       i. Gatorade's Descriptive Use of "Sports Fuel" and Its Prominent Use of GATORADE® and the G-Bolt Mark Show Good Faith ......... 25

       ii. The Changes to the Fair Use Defense Advocated by SportFuel Have No Justification................................................................ 26

       iii. SportFuel Presented No Evidence of Bad Faith........................ 28

d.  *KP Permanent Make-Up* Did Not Require the District Court to Analyze the Likelihood of Confusion Factors Before Granting Summary Judgment for Gatorade on Its Fair Use Defense ..................... 31

2.  The Court Should Affirm the District Court's Grant of Summary Judgment on the Alternative Ground That There Is No Likelihood of Confusion ........................................................................................................ 32

a.  This Court Can Affirm Summary Judgment on an Alternative Ground ................................................................................................................ 32

b.  A Likelihood of Confusion Is Not Probable ................................................ 33

i.  SportFuel's Mark and Gatorade's Slogan Are Not Confusingly Similar .................................................................................................. 34

ii.  The Parties' Trade Channels Do Not Overlap ......................................... 37

iii.  The Parties' Goods and Services Are Not Confusingly Similar ................ 38

iv.  SportFuel's High Prices and Health-Conscious Consumers Make Confusion Unlikely ............................................................................... 39

v.  SportFuel's Mark Is Conceptually ........................................................... 40
    and Commercially Weak ......................................................................... 40

vi.  The Intent Factor Is Irrelevant ............................................................... 43

vii.  There Is No Evidence of Actual Confusion ............................................. 43

c.  SportFuel's Surveys Do Not Create a Genuine Issue of Material Fact .... 44

i.  Mr. Hollander's Survey Is Unreliable and Irrelevant .............................. 45

ii.  Mr. Berger's Survey Is Unreliable and Irrelevant .................................. 50

3.  SportFuel Waived All Issues Concerning Any Other Use of "Sports Fuel" .................................................................................................................... 52

CONCLUSION ....................................................................................................... 55

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,*
   237 F.3d 198 (3rd Cir. 2000) ................................................................. 41

*Allen Bros., Inc. v. AB Foods LLC,*
   No. 06 C 1269, 2008 WL 345600 (N.D. Ill. Feb. 6, 2008) ............................. 39, 41

*Americana Trading Inc. v. Russ Berrie & Co.,*
   966 F.2d 1284 (9th Cir. 1992) ............................................................... 28

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ........................................................................ 12

*Arnold v. ABC, Inc.,*
   No. 06 Civ. 1747, 2007 WL 210330 (S.D.N.Y. Jan. 29, 2007) ........................ 22

*AutoZone, Inc. v. Tandy Corp.,*
   373 F.3d 786 (6th Cir. 2004) ............................................................... 51

*B & L Sales Assocs. v. H. Daroff & Sons, Inc.,*
   421 F.2d 352 (2d Cir. 1970) ............................................................ 17, 22

*Bell v. Harley Davidson Motor Co.,*
   539 F. Supp. 2d 1249 (S.D. Cal. 2008) ................................................... 19

*Black & Decker Corp. v. Positec USA Inc.,*
   No. 11-cv-5426, 2017 WL 4010922 (N.D. Ill. Sept. 11, 2017) ..................... 47, 51

*Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.,*
   781 F.2d 604 (7th Cir. 1986) ............................................................... 24

*Car-Freshner Corp. v. S.C. Johnson & Son, Inc.,*
   70 F.3d 267 (2d Cir. 1995) ............................................................. 12, 26

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ........................................................................ 11

*Chattanoga Mfg., Inc. v. Nike, Inc.,*
   140 F. Supp. 2d 917 (N.D. Ill. 2001), *aff'd as modified*, 301 F.3d 789
   (7th Cir. 2002) ............................................................................. 15

*Ciociola v. Harley-Davidson Inc.*,
  552 F. Supp. 2d 845 (E.D. Wis. 2008) ................................................... 18

*Coherent, Inc. v. Coherent Techs., Inc.*,
  935 F.2d 1122 (10th Cir. 1991) ........................................................ 48

*Cohn v. Petsmart, Inc.*,
  281 F.3d 837 (9th Cir. 2002) .......................................................... 36

*Cooper v. Lane*,
  969 F.2d 368 (7th Cir. 1992) ...................................................... 30, 53

*Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*,
  125 F.3d 28 (2d Cir. 1997) ......................................................... 26, 31

*Covenant Media of SC, LLC v. City Of N. Charleston*,
  493 F.3d 421 (4th Cir. 2007) .......................................................... 32

*Custom Vehicles, Inc. v. Forest River, Inc.*,
  476 F.3d 481 (7th Cir. 2007) .......................................................... 28

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) .................................................................. 45

*Diliberti v. United States*,
  817 F.2d 1259 (7th Cir. 1987) ......................................................... 32

*Echo Drain v. Newsted*,
  307 F. Supp. 2d 1116 (C.D. Cal. 2003)................................................. 42

*Eli Lilly & Co. v. Revlon, Inc.*,
  577 F. Supp. 477 (S.D.N.Y. 1983) .................................................... 22

*Evory v. RJM Acquisitions Funding L.L.C.*,
  505 F.3d 769 (7th Cir. 2007) .......................................................... 45

*Fleishman v. Cont'l Cas. Co.*,
  698 F.3d 598 (7th Cir. 2012) .......................................................... 53

*Fortres Grand Corp. v. Warner Bros. Entm't Inc.*,
  763 F.3d 696 (7th Cir. 2014) .......................................................... 27

*Gimix, Inc. v. JS & A Grp., Inc.*,
  699 F.2d 901 (7th Cir. 1983) .......................................................... 32

*Henri's Food Prods. Co. v. Kraft, Inc.*,
  717 F.2d 352 (7th Cir. 1983) .......................................................... 34

*In re Boston Beer Co.,*
198 F.3d 1370 (Fed. Cir. 1999) ........................................................ 24, 25

*In re Chamber of Commerce of the U.S.,*
675 F.3d 1297 (Fed. Cir. 2012) ............................................................. 14

*In re Dial-A-Mattress Operating Corp.,*
240 F.3d 1341 (Fed. Cir. 2001) ............................................................. 15

*In re Fluidmaster, Inc.,*
No. 14-cv-5696, 2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) ................ 46

*In re Nosler Bullets, Inc.,*
169 U.S.P.Q. 62, 1971 WL 16439 (TTAB 1971) ..................................... 23

*In re Remington Products Inc.,*
3 U.S.P.Q.2d 1714, 1987 WL 124304 (TTAB 1987) ............................... 23

*Int'l Stamp Art, Inc. v. U.S. Postal Serv.,*
456 F.3d 1270 (11th Cir. 2006) ............................................................. 25

*J.T. Colby & Co., Inc. v. Apple Inc.,*
No. 11 Civ. 4060, 2013 WL 1903883 (S.D.N.Y. May 8, 2013) ................ 47

*Kargo Global Inc. v. Advance Magazine Publishers, Inc.,*
2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007) ............................................ 49

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.,*
543 U.S. 111 (2004) ................................................................ 31, 32, 55

*Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.,*
452 F. Supp. 2d 772 (W.D. Mich. 2006) ........................................... 46, 47

*Libman Co. v. Vining Indus., Inc.,*
69 F.3d 1360 (7th Cir. 1995) ................................................................ 44

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.,*
525 F. Supp. 2d 558 (S.D.N.Y. 2007) ............................................... 46, 52

*Luigino's, Inc. v. Stouffer Corp.,*
170 F.3d 827 (8th Cir. 1999) ................................................................ 40

*M.B.H. Enters., Inc. v. WOKY, Inc.,*
633 F.2d 50 (7th Cir. 1980) .........................................................*passim*

*M.D. On-Line, Inc. v. WebMD Corp.,*
No. 05-CV-4081, 2005 WL 2469668 (D.N.J. Oct. 6, 2005) ................... 50

*Maxim's Ltd. v. Badonsky*,
   772 F.2d 388 (7th Cir. 1985) ................................................................ 40

*Munters Corp. v. Matsui Am., Inc.*,
   730 F. Supp. 790 (N.D. Ill. 1989) ........................................................ 29

*Nabisco v. Warner-Lambert Co.*,
   32 F. Supp. 2d 690 (S.D.N.Y. 1999), *aff'd sub nom. Nabisco, Inc. v.*
   *Warner-Lambert Co.*, 220 F.3d 43 (2d Cir. 2000) ................................ 49

*Native Am. Arts, Inc. v. Bud K World Wide, Inc.*,
   No. 7:10-CV-124, 2012 WL 1833877 (M.D. Ga. May 18, 2012) ........... 51

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
   638 F.3d 1137 (9th Cir. 2011) ............................................................. 37

*Noasha LLC v. Nordic Grp. of Cos.*,
   630 F. Supp. 2d 544 (E.D. Pa. 2009) ................................................... 42

*Nutri/System, Inc. v. Con–Stan Indus.*,
   809 F.2d 601 (9th Cir. 1987) ............................................................... 39

*Oreck Corp. v. U.S. Floor Sys., Inc.*,
   803 F.2d 166 (5th Cir. 1986) ............................................................... 44

*Packman v. Chicago Tribune Co.*,
   267 F.3d 628 (7th Cir. 2001) ......................................................*passim*

*Patterson v. TNA Entm't, LLC*,
   No. 04-C-0192, 2006 WL 3091136 (E.D. Wis. Oct. 27, 2006) .............. 34

*Plus Prods. v. Plus Disc. Foods, Inc.*,
   722 F.2d 999 (2d Cir. 1983) ................................................................ 39

*Pond v. Michelin North Am., Inc.*,
   183 F.3d 592 (7th Cir. 1999) ............................................................... 54

*Poneman v. Nike, Inc.*,
   161 F. Supp. 3d 619 (N.D. Ill. 2016) .................................................. 39

*Powerhouse Marks LLC v. Chi Hsin Impex, Inc.*,
   No. 04-73923, 2006 WL 897254 (E.D. Mich. Apr. 5, 2006) ................. 50

*R.J. Corr Naturals, Inc. v. Coca-Cola Co.*,
   No. 97 C 1059, 1997 WL 223058 (N.D. Ill. Apr. 29, 1997) ................. 40

*S Indus., Inc. v. GMI Holdings, Inc.*,
No. 96 C 2232, 1998 WL 67627 (N.D. Ill. Jan. 30, 1998) ..................................... 36

*Sands, Taylor & Wood Co. v. The Quaker Oats Co.*,
978 F.2d 947 (7th Cir. 1992) ..........................................................*passim*

*Sands, Taylor & Wood v. Quaker Oats Co.*,
No. 84 C 8075, 1990 WL 251914 (N.D. Ill. 1990), *aff'd in part, rev'd
in part sub nom.*, 978 F.2d 947 (7th Cir. 1992) ..................................... 43

*Scandaglia v. TransUnion Interactive, Inc.*,
No. 09 C 2121, 2010 WL 3526653 (N.D. Ill. Sept. 1, 2010)................................. 19

*Scott Fetzer Co. v. House of Vacuums, Inc.*,
381 F.3d 477 (5th Cir. 2004) ......................................................... 46

*Sears, Roebuck & Co. v. Menard, Inc.*,
2003 WL 168642 (N.D. Ill. Jan. 24, 2003) ........................................... 52

*Simon Prop. Grp. L.P. v. mySimon, Inc.*,
104 F. Supp. 2d 1033 (S.D. Ind. 2000)........................................... 45, 48

*Sorensen v. WD-40 Co.*,
792 F.3d 712 (7th Cir. 2015) ..........................................................*passim*

*Spraying Systems Co. v. Delavan, Inc.*,
975 F.2d 387 (7th Cir. 1992) ...................................................... 24, 44

*Starter Corp. v. Converse, Inc.*,
170 F.3d 286 (2d Cir. 1999)......................................................... 47

*Sullivan v. CBS Corp.*,
385 F.3d 772 (7th Cir. 2004) ....................................................... 12

*Sunmark, Inc. v. Ocean Spray Cranberries*,
64 F.3d 1055 (7th Cir. 1995) .................................................... 13, 16

*Surfvivor Media, Inc. v. Survivor Prods.*,
406 F.3d 625 (9th Cir. 2005) ...................................................... 37

*Telemed Corp. v. Tel-Med, Inc.*,
588 F.2d 213 (7th Cir. 1978) .................................................... 14, 41

*THOIP v. Walt Disney Co.*,
690 F. Supp. 2d 218 (S.D.N.Y. 2010) ................................................ 47

*Top Tobacco, L.P. v. N. Atl. Operating Co.*,
    No. 06 C 950, 2007 WL 118527 (N.D. Ill. Jan. 4, 2007), *aff'd*, 509
    F.3d 380 (7th Cir. 2007) ....................................................................................... 34

*Trouble v. Wet Seal, Inc.*,
    179 F. Supp. 2d 291 (S.D.N.Y. 2001) ...................................................... 51

*Tsiolis v. Interscope Records, Inc.*,
    946 F. Supp. 1344 (N.D. Ill. 1996) ................................................... 41, 43

*Vista Food Exchange, Inc. v. Vistar Corp.*,
    No. 03-CV-5203, 2005 WL 2371958 (E.D.N.Y. Sept. 27, 2005) ............................ 49

*W.W.W. Pharm. Co. v. Gillette Co.*,
    984 F.2d 567 (2d Cir. 1993), *abrogated on other grounds by Deere &
    Co. v. MTD Prods., Inc.*, 41 F.3d 39 (2d Cir. 1994) ................................................ 36

*Walter v. Mattel, Inc.*,
    210 F.3d 1108 (9th Cir. 2000) ................................................................... 28

*Wonder Labs, Inc. v. Procter & Gamble Co.*,
    728 F. Supp. 1058 (S.D.N.Y. 1990) ...................................................... 16

*World Wide Sales, Inc. v. Church & Dwight Co., Inc.*,
    No. 08 C 1198, 2009 WL 3765881 (N.D. Ill. Nov. 9, 2009)............................. 42, 43

*Ye Olde Tavern Cheese Prod., Inc. v. Planters Peanuts Div., Standard
    Brands Inc.*,
    261 F. Supp. 200 (N.D. Ill. 1966), *aff'd*, 394 F.2d 833 (7th Cir. 1967).................. 40

*Ziebert Int'l Corp. v. After Mkt. Assocs., Inc.*,
    802 F.2d 220 (7th Cir. 1986) ................................................................... 33

## Statutes

15 U.S.C. § 1115(b)(4) ................................................................ 13, 24, 32

15 U.S.C. § 1127................................................................................ 16

28 U.S.C. § 1332................................................................................. 1

Lanham Act, 15 U.S.C. § 1051 et seq................................................*passim*

## Rules

Fed. R. Civ. P. 1 ......................................................................... 11

Fed. R. Civ. P. 56 ............................................................................ 11

Fed. R. Civ. P. 56(a) ....................................................................... 11

Fed. R. Evid. 403............................................................................ 45, 51

Fed. R. Evid. 702............................................................................ 44, 51

Local Rule 56.1............................................................................... 54

**Other Authorities**

J. Thomas McCarthy, McCarthy on Trademarks and Unfair
    Competion, § 32:172 (5th ed. 2018)....................................... 52

J. Thomas McCarthy, McCarthy on Trademarks and Unfair
    Competition, § 23:120 (5th ed. 2018) ................................... 26

J. Thomas McCarthy, McCarthy on Trademarks and Unfair
    Competition, § 32:159 (5th ed. 2018) ...................... 34, 39, 45

J. Thomas McCarthy, McCarthy on Trademarks and Unfair
    Competition, § 7:22 (5th ed. 2018) ....................................... 13

J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR
    COMPETITION, § 15:2 (2d ed. 1984)........................................ 24

## COUNTER STATEMENT OF JURISDICTION

SportFuel's Statement of Jurisdiction is complete and correct except for the inclusion of 28 U.S.C. § 1332 in the list of statutes under which the District Court had original subject matter jurisdiction because there is not complete diversity between the parties. Appellant SportFuel, Inc.'s ("SportFuel") principal place of business is in Illinois. Appellee The Gatorade Company's principal place of business is in Illinois, and it is a wholly owned indirect subsidiary of Appellee PepsiCo, Inc. (collectively, "Gatorade").

## COUNTER STATEMENT OF THE ISSUES ON APPEAL

1. Whether the District Court correctly held that Gatorade was entitled to summary judgment on its fair use defense when there were no genuine issues for trial because Gatorade descriptively uses "sports fuel," in good faith, and does not use "sports fuel" as a trademark.

2. In the alternative, whether Gatorade is entitled to summary judgment on the ground that no likelihood of confusion exists because the undisputed facts in the record show the parties' marks are dissimilar, the parties' goods/services are dissimilar, there is no overlap in sales or marketing channels, SportFuel's consumers will exercise care, SportFuel's asserted mark is weak, and there is no evidence actual confusion.

3. Whether the District Court correctly held that SportFuel waived all arguments regarding "sports fuel" apart from the slogan by failing to make any argument in response to Gatorade demonstrating "sports fuel" in Gatorade Prime®

Sports Fuel Drink and otherwise is a fair use and, alternatively, creates no likelihood of confusion.

## COUNTER STATEMENT OF THE CASE

1. <u>Gatorade</u>

The first Gatorade® sports drink was developed through scientific research in 1965. (Dkt. 59 ¶ 2.) Today, Gatorade is the official sports drink of many professional and collegiate teams and organizations, including the NBA, AVP Beach Volleyball, PGA, MLB, and MLS. (*See id.* at ¶ 3.) SportFuel acknowledges that Gatorade's sports drinks are well known. (Dkt. 61-1/61-2 at 89:2-7.)

Gatorade has used "fuel" and similar terms in its marketing materials since at least as early as 1999. (*See* Dkts. 61-4 ("stay cooled and fueled"), 61-5 ("it keeps them refueled"), 61-6 ("Gatorade is the winning solution for refueling").) "Fuel" is intended to communicate that Gatorade's products provide carbohydrates or other sources of energy to athletes. (Dkt. 59 ¶¶ 11–12; Dkt. 61-12 at GAT_0011822.) Indeed, SportFuel and its founder have described Gatorade's products as "fuel" in its deposition and in materials its founder authored. (*See* Dkt. 61-1/61-2 at 45:10-12, 90:5-9, 102:4-17, 244:8-12, Exs. 12, 22–23.)

a. **Gatorade's Use of "Gatorade The Sports Fuel Company"**

Gatorade also sells a wide variety of food and beverage products, including bars, chews, protein bars, protein shakes, protein powders, and gels. (Dkt. 59 ¶¶ 6–7.) These products are specifically designed to help improve performance in sports activities. (*See id.* at ¶ 13.) To describe these products, Gatorade started to use the

term "sports fuel" internally in 2012, and publicly in 2013. (*See id.* at ¶ 10; Dkt. 61-8 at 1–2; Dkt. 61-9 at 4; Dkt. 61-10 at 1-2; Dkt. 61-11 at GAT_0001968.)

Because it has evolved to become more than just a sports drink company, Gatorade uses the tagline "Gatorade The Sports Fuel Company" in some of its advertising and point-of-sale displays. (*See* Dkt. 59 ¶¶ 14–15.) This tagline has never appeared on any product packaging. (*Id.* at ¶¶ 16, 20.) As illustrated below, whenever the tagline is used, "GATORADE" is always the most prominent word, appearing bolded and often in larger font than the other words. (*See id.* at ¶¶ 17-18; *see also* Dkt. 61-15.)



Gatorade used this tagline internally as early as 2013, and started publicly describing itself as "Gatorade The Sports Fuel Company" in November 2015. (*See* Dkt. 59 at ¶ 19; Dkt. 61-7 at Supp. Rog. Resp. Nos. 7, 12.) "Gatorade The Sports Fuel Company" is one of many slogans used by Gatorade. (*See* Dkt. 61-3 at 114:2-8.) Gatorade applied to register "Gatorade The Sports Fuel Company" in connection with various types of food and beverages in 2015, but it disclaimed the words "The Sports Fuel Company" because it does not claim rights to this descriptive phrase. (*See* Dkt. 61-13 at GAT0000283, GAT0000289.) Gatorade uses the terms "sports fuel" and "fuel" in a variety of other descriptive ways to refer to its sports fuel products. (*See, e.g.*, Dkt. 61-14 ("The Proven Sports Fuel"), Dkt. 61-15 at GAT_0006639, GAT_0006648 ("Rehydrate. Replenish. Refuel."), Dkt. 61-16 ("Eat.

Fuel. Repeat."), Dkt. 61-17 ("Fuel & Protein for athletes"), Dkt. 61-18 ("Fuel like the pros"), Dkt. 61-19 ("On-the-go fuel to help athletes compete"), Dkt. 61-20 ("Fuel formulated for athletes")．) Gatorade does not use, and has never used, the term "sportfuel." (Dkt. 59 ¶ 21.)

Gatorade wants consumers to know that they are buying Gatorade products. (*See id.* at ¶¶ 25–28.) So it always uses one or more of its famous GATORADE or  ("G-Bolt Design Mark") marks (with its characteristic orange lightning bolt) on packaging and advertisements, including point-of-sale displays. (*See id.*) Examples of product packaging are shown below. (*See id.* at ¶ 29.)



### b. Gatorade's Sales and Marketing Channels

Gatorade's products are offered for sale nationwide in a wide variety of mass brick-and-mortar and online outlets. (*See id.* at ¶ 30; Dkt. 61-3 at 85:2-86:3.) Gatorade's suggested retail prices for Gatorade's products range from $1.19 to $47.90 (for a Protein Pack bundle). (Dkt. 59 ¶ 31.)

Gatorade advertises its products through point-of-sale displays, traditional print media, billboards, television, radio, social media, and its website. (*See id.* at ¶ 32.) It partners with athletes and sports teams that use Gatorade's products on the sidelines at televised sporting events. (*See id.*)

### 2. Third-Party Use of "SportFuel," "Sports Fuel," and "Fuel"

A former partner of SportFuel started selling SPORTFUEL protein powder before SportFuel offered any products for sale, and his company still offers it today. (*See* Dkt. 61-1/61-2 at 131:17-19, 169:24-170:10, 177:1-4, Ex. 34 at 133; Dkt. 61-22; Dkt. 61-23; Dkt. 61-26.) Numerous other third parties have used "sports fuel" in product names, including SPORT FUEL by Twin Laboratories, SPORTS FUEL by Trident Sports, Science In Sport Go Energy Sports Fuel, Golazo Natural Sports Fuel, ChampION Sports Fuel, Nectar Sports Fuel Concentrate, and Maurten Hydrogel Sports Fuel. (*See* Dkt. 61-1/61-2 at Exs. 26-27, 29, 30, 39; Dkt. 61-24; Dkt. 61-25.) Many others have used the term "fuel" descriptively on packaging or in advertisements. (*See* Dkt. 61-1/61-2 at Exs. 6, 14 ("Wheaties Fuel"), 16, 17 at 3 ("Powerade Fuel +").)

Third parties have also used the terms "sports fuel" and "fuel" as a descriptive or generic term for foods or beverages used in connection with physical activities. (*See, e.g.*, *id.* at Exs. 25 ("food fuel / sports fuel / life fuel / travel fuel"), 49 ("Train Your Gut to Handle GU (and Other Sports Fuel)", 52 ("Pre-Game Meal: Fuel for Sports").) The sports science community also uses "fuel" to refer to foods and beverages. (*See id.* at Exs. 51 ("Calories and nutrients to fuel sports performance"), 53 ("Ready, Set,

Fuel: How to Fuel Your Performance with Sports Nutrition"), 54 ("How to Fuel for Your First Marathon"), 55 ("Fueling Your Sport"); Dkt. 61-12 at GAT_0011823.).)

Even SportFuel uses the term descriptively in presentations and on its website. (*See, e.g.*, Dkt. 61-1/61-2 at 85:6-24, 243:13-17, 244:8-12, Exs. 4, 5 p.1 ("we believe the best way to fuel the body . . . ."), 12 p.2, 50 p.19 ("identify the fuel type needed for training and sport").)

SportFuel admitted it is not concerned by uses of "fuel" alone by Gatorade or others. (*See id.* at 69:11-23, 94:11-95:5, 95:14-19, 97:9-13, 100:11-14, Exs. 6, 14–19, 21.)

### 3. SportFuel

SportFuel is a sports nutrition and wellness consulting firm started in 1993. (*See id.* at 11:24-12:8, 26:3-21, 155:24-156:3.) It provides "personalized performance" nutrition consulting services. (*Id.* at Ex. 4, pp. 1, 3.) Its competitors are other nutritionists. (*See id.* at 163:14-164:6, Ex. 33 at SF021067.)

"SPORTFUEL" was chosen as the name for the company because the founder was working with athletes as a nutritionist and wanted to continue working in sports nutrition. (*See id.* at 92:7-22.) SportFuel admits "fuel" can refer to food or drink as a source of energy. (*See id.* at 45:4-12.) As it explained, one puts food into the body to "fuel" it, like gas is put into a car, and anything with calories can be considered fuel. (*See id.* 45:1-12, 60:14-22.)

### a. SportFuel's Use of Its Mark

SportFuel always uses SPORTFUEL as one word. (*See id.* at 19:5-7.) Its SPORTFUEL mark appears in a stylized manner, with rounded font and a fuel

gauge in place of the "o." (*See id.* at Exs. 4–5, 7–10.) SportFuel uses a blue and gray color scheme. (*See id.* at 83:3-9.) It has never used a "G" or a lightning bolt on products. (*See id.* at 98:23-99:4.)

SportFuel's customers include athletes and health-conscious individuals. (*See id.* at 62:9-15,163:11-13.) Its lowest-priced option for an initial consultation is $295. (*See id.* at 46:11-22, Ex. 5.) Follow-up calls are not included and cost $80 for a 30-minute call and $160 for a 60-minute call. (*See id.*) If an individual wants to engage the founder, they must do so at a minimum of $995 per month for a minimum of three months. (*See id.* at 47:2-6.) The contract prices for athletic teams are dramatically higher. (*See id.* at 104:9-22.)

SportFuel sells three nutritional powders and a vitamin D supplement. (*See id.* at Exs. 7–10.) The prices of these products range from $25.95 to $51.90. (*See* Dkt. 61-29 at SF021711-12.) SportFuel claimed it first started offering these products publicly between 2014 and 2015. (*See* Dkt. 61-1/61-2 at 169:24-170:10, 177:1-4, Ex. 34 at 133.) Its sales of these products are minimal. (*See* Dkt. 61 ¶ 31; Dkt. 61-28; Dkt. 61-29.)

### b. SportFuel's Sales and Marketing Channels

None of SportFuel's products are available in any physical or online retail outlet. (*See* Dkt. 61-1/61-2 at 41:8-16; 165:10-20.) A consumer has to contact SportFuel to purchase one of its supplements. (*See id.* at 59:14-20.) To even learn SportFuel sells products, a consumer has to be a client of SportFuel or learn from word of mouth. (*See id.* at 38:10-24.) SportFuel's products were temporarily available for sale on SportFuel's website, but the webpage was password protected because some of the

products could only be sold to licensed health care professionals that give an assessment to the customer before providing the products. (*See id.* at 36:20-37:6, 40:13-41:7.)

SportFuel relies on its website and word of mouth to advertise. (*See id.* at 24:2-5, 38:10-24, 109:11-23.) It has only purchased one print advertisement for $400 in 2008 for another company owned by the founder of SportFuel. (*See id.* at 109:24-110:5, Ex. 41; Dkt. 61-30.) Otherwise, SportFuel has never purchased any other form of advertising. (*See id.* at 109:24-110:5, 110:13-14.) The founder of SportFuel has given interviews, but they focused on nutritional advice and were not about the company. (*See* Dkt. 61-31.)

### c. SportFuel Admitted It Has No Evidence of Actual Confusion, an Intent to Harm, or Damage Suffered

Despite several years of coexistence, neither party is aware of a single consumer who purchased any of SportFuel's goods or services believing it was from or authorized by Gatorade, or who purchased one of Gatorade's products believing it was from or authorized by SportFuel. (*See* Dkt. 61-1/61-2 at 112:22-113:7; Dkt. 59 ¶ 36.) SportFuel has no evidence that individuals responsible for creating the tagline "Gatorade The Sports Fuel Company," or naming the Gatorade Prime® Sports Fuel Drink product, had any knowledge of SportFuel or its use of SPORTFUEL. (Dkt. 61 ¶ 22.) Moreover, SportFuel admits it has no evidence Gatorade intended to confuse consumers or push SportFuel out of the market by using the term "sports fuel." (*See* Dkt. 61-1/61-2 at 297:3-21.) SportFuel further admitted it is not aware of a single

sale lost or any reputational harm suffered as a result of Gatorade's actions. (*See id.* at 118:2–7; 118:13–15, 303:18–304:10.)

### 4. The District Court Granted Summary Judgment for Gatorade

On January 10, 2018, Gatorade filed a motion for summary judgment and supporting reply (Dkts. 44–69, 73–74, 86–88, collectively "Motion") asserting that SportFuel's claims failed as a matter of law for two independent, alternative reasons: (1) there is no likelihood of confusion between the slogan "Gatorade The Sports Fuel Company" and SportFuel's use of SPORTFUEL for nutrition consulting services and nutritional supplements; and (2) Gatorade's use of "sports fuel" is a fair use protected by the Lanham Act. Either ground would have been a sufficient basis for summary judgment.

After considering the undisputed record facts, and examining and opining on each of the factors for the doctrine of fair use, on June 14, 2018, the District Court issued a comprehensive memorandum and opinion finding Gatorade's use of "sports fuel" was a fair use protected by the Lanham Act and entered judgment for Gatorade on all of SportFuel's claims. (*See* Brief at A-2–16.[1])

### SUMMARY OF ARGUMENT

The basic issue raised by SportFuel in its appeal is simple. If this Court finds Gatorade uses the term "sports fuel" to describe in good faith a characteristic of Gatorade's products, then the District Court's grant of summary judgment for Gatorade on its fair use defense should be affirmed.

---

[1] Citations to the Short Appendix in SportFuel's Brief are indicated by "A-__."

Fair use is a fundamental part of trademark law because a trademark is not intended to give a monopoly over descriptive terms. Other parties have the right to use words and phrases in good faith to describe a characteristic of their goods and services—regardless of how similar that word or phrase is to what another party claims as its trademark.

Gatorade uses "sports fuel" in good faith to describe characteristics of its products. In addition to its well-known sports drinks, Gatorade sells various food products specifically designed to help fuel sports activities. To reflect this, Gatorade uses the laudatory slogan "Gatorade The Sports Fuel Company" in select marketing. Gatorade consistently highlights its Gatorade mark as part of this slogan, so the source of its products is unmistakable. "Sports fuel" is never emphasized in the slogan, and Gatorade does not claim trademark rights in the term. Indeed, other third parties descriptively use "sports fuel." As the District Court correctly found, SportFuel's claims against Gatorade fail as a matter of law because, on the record evidence presented, no reasonable jury could find Gatorade's use of "sports fuel" in "Gatorade The Sports Fuel Company" is not a fair use.

As an alternative ground for upholding the District Court's dismissal of all claims against Gatorade, there is also no genuine issue of material fact that would support a likelihood of confusion is probable. As used by the parties, "Gatorade The Sports Fuel Company" is not similar in appearance to SportFuel's claimed SPORTFUEL mark. Gatorade has used this slogan for several years without a single instance of actual confusion. There is no overlap between the parties' sales

and marketing channels. SportFuel's primary business is selling expensive nutrition consulting services. This not only shows the parties' businesses are different, but the high cost and nature of SportFuel's business also means consumers exercise care and attention before purchasing anything from SportFuel, minimizing any possibility of confusion. Indeed, SportFuel admitted it was suffering no harm. SportFuel's unreliable and irrelevant surveys are insufficient to create an issue of fact necessitating trial in this case. Remand is neither appropriate nor necessary, as a de novo review of the record before this Court supports affirming on this alternate ground.

## STATEMENT OF THE STANDARD OF REVIEW

The review of a district court's grant of summary judgment is de novo. *See Packman v. Chicago Tribune Co.*, 267 F.3d 628, 637 (7th Cir. 2001).

Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). Federal Rule of Civil Procedure 56 must be construed not only for the party asserting its claims, but also for the rights of the opposing party to demonstrate that the claims asserted against it have no factual basis. *See id.* A court must grant summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is "genuine" only "if the evidence is such that a reasonable jury could return

a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "material" only if it might affect the outcome of the case under governing law. *Id.*

The Seventh Circuit has not hesitated to grant summary judgment for defendants in trademark cases. *See, e.g., Packman*, 267 F.3d at 647 (upholding summary judgment for defendant on fair use defense and no likelihood of confusion); *Sorensen v. WD-40 Co.*, 792 F.3d 712, 725–26, 732 (7th Cir. 2015) (same); *Sullivan v. CBS Corp.*, 385 F.3d 772, 779 (7th Cir. 2004) (affirming summary judgment for defendant because there was no likelihood of confusion).

## ARGUMENT

### 1. The District Court Correctly Ruled That Gatorade Was Entitled to Summary Judgment on Its Fair Use Defense

It is a fundamental principle of trademark law "that, although trademark rights may be acquired in a word or image with descriptive qualities, the acquisition of such rights will not prevent others from using the word or image in good faith in its descriptive sense, and not as a trademark." *Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 269 (2d Cir. 1995) (collecting cases). "The principle is of great importance because it protects the right of society at large to use words or images in their primary descriptive sense, as against the claims of a trademark owner to exclusivity." *Id.* In other words, an owner of a registered mark cannot appropriate common English terms and prevent others from using those terms in their descriptive sense. *M.B.H. Enters., Inc. v. WOKY, Inc.*, 633 F.2d 50, 55 (7th Cir. 1980). This is true even if the plaintiff's registration is "incontestable" under the

Lanham Act. *See* 15 U.S.C. 1115(b)(4); *Sunmark, Inc. v. Ocean Spray Cranberries*, 64 F.3d 1055, 1058 (7th Cir. 1995). By way of illustration, a producer of a "Crunchy" brand of potato chips cannot block others from describing their chips as crunchy. *See Sorensen*, 792 F.3d at 722.

The fair use doctrine embodies these principles of trademark law. It is a complete defense to trademark infringement claims. *See* 15 U.S.C. § 1115(b)(4). To establish fair use, Gatorade must show "sports fuel" is: (1) descriptive of its goods; (2) a non-trademark use; and (3) used fairly and in good faith only to describe its goods or services. *See id.*

### a. "Sports Fuel" Describes Gatorade's Products

"For a word or mark to be considered descriptive it merely needs to refer to a characteristic of the product." *Sunmark, Inc.*, 64 F.3d at 1059 (upholding "sweet-tart" is descriptive for a cranberry-based drink). A term does not need to appear in the dictionary to be considered descriptive. *See id.* Similarly, a tagline is descriptive "if it directly points out or refers to a characteristic of the goods." 1 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 7:22 (5th ed. 2018). A descriptive term or phrase directly imparts information. *M.B.H. Enters., Inc.*, 633 F.2d at 55.

SportFuel admitted Gatorade is one of the companies that "sells products that fuel athletes for sports." (Dkt. 61-1/61-2 at 90:5-9.) And that is what Gatorade does; it sells products that provide carbohydrates or other sources of energy to athletes and are specifically designed to help improve performance in sports. (*See* Dkt. 59 ¶¶ 11, 13; Dkt. 61-9 at 1; Dkt. 61-12 at GAT_0011822.) Gatorade is using "sports" and

"fuel" in their commonly understood meaning—fuel (food or drink) for sports. (*See* Dkt. 61-13 at GAT0000298 (defining "sport" as an activity involving physical exertion, skill, and competition for entertainment), GAT0000301 (defining "fuel" as "food, drink, or drugs as a source of energy")).) This is further illustrated by Gatorade-branded products used at sporting events and advertisements often featuring athletes. (*See* Dkt. 59 ¶¶ 33–35.) SportFuel itself has used the term "fuel" to reference Gatorade® products. (*See, e.g.*, Dkt. 61-1/61-2 at 45:10-12, 90:5-9, 102:4-17, 244:8-12, Exs. 12, 22–23.) "Sports fuel" thus describes characteristics of products Gatorade offers and directly imparts information about the type of company Gatorade is. *See Sorensen*, 792 F.3d at 724 (holding no imagination was required to connect the term "Corrosion Inhibitor" with a product that was designed to inhibit rust and other forms of corrosion); *Telemed Corp. v. Tel-Med, Inc.*, 588 F.2d 213, 217 (7th Cir. 1978) (holding Telemed and Tel-Med descriptive of providing commercial computer analysis of electrocardiograms over the telephone and providing healthcare information over the telephone); *M.B.H. Enters.*, 633 F.2d at 55 (holding "WOKY LOVES MILWAUKEE" descriptive because it imparted information directly; the defendant meant it liked Milwaukee).

The term "sports fuel" does not need to describe *every* characteristic of everything sold by Gatorade, or every manner in which consumers may use Gatorade's products, to be descriptive. It just needs to describe *a* characteristic. *See In re Chamber of Commerce of the U.S.*, 675 F.3d 1297, 1300 (Fed. Cir. 2012) ("A mark 'need not recite each feature of the relevant goods or services in detail to be

descriptive, it need only describe a single feature or attribute.'" (quoting *In re Dial-A-Mattress Operating Corp.*, 240 F.3d 1341, 1346 (Fed. Cir. 2001) (rejecting argument that 1-888-MATRESS is not descriptive because it does not describe full scope and extent of services offered by applicant)). Applying the test in the way SportFuel advocates in its Appellant's Brief ("Brief" at 44–45) would severely curtail what would be considered "descriptive" under trademark law and would give SportFuel an unwarranted monopoly over the descriptive uses of "sports fuel."

There is also no basis for presuming "sports fuel" is suggestive as used by Gatorade. Unlike the JORDAN registration at issue in the *Chattanoga* case relied on by SportFuel (Brief 43), which contained no disclaimer of rights, the registration for "Gatorade The Sports Fuel Company" expressly disclaims exclusive rights to "The Sports Fuel Company." *See Chattanoga Mfg., Inc. v. Nike, Inc.*, 140 F. Supp. 2d 917, 923 (N.D. Ill. 2001), *aff'd as modified*, 301 F.3d 789 (7th Cir. 2002). The USPTO found, and Gatorade agreed, "The Sports Fuel Company" "merely describes an ingredient, quality, characteristic, function, feature, purpose, or use of [Gatorade's] goods and/or services, and thus is an unregistrable component of the mark." (Dkt. 61-13 at GAT0000289.) The USPTO also observed that "sports fuel" is "commonly used in reference to sports nutrition" and, as such, "consumers encountering the wording THE SPORTS FUEL COMPANY in the proposed mark would readily understand it to mean that the goods are provided by a company that provides sports nutrition." (*Id.*)

It is irrelevant whether SportFuel's claimed SPORTFUEL mark is descriptive or suggestive.[2] *See Sunmark, Inc.*, 64 F.3d at 1058 ("Under the Lanham Act it is irrelevant whether the [plaintiff's] mark is itself descriptive, and the district court did not need to pursue the question."). Thus, SportFuel's arguments about the alleged suggestiveness of its mark (Brief 46) should be ignored.

### b. Gatorade Does Not Use "Sports Fuel" as a Trademark

#### i. The Undisputed Evidence Shows "Sports Fuel" Is Used Descriptively

A trademark is any word, name, symbol, or device used by a person to distinguish its goods from those of others and to indicate the source of its goods. 15 U.S.C. § 1127. Despite SportFuel's references to the "used in commerce" definition (Brief 28–29), use of a term on a container, display, label, or tag is not the definition of a trademark.

Nothing in the slogan shows "sports fuel" is being used as a trademark. "Sports fuel" is embedded in a slogan and not accentuated. There is no reason for "sports fuel" to be perceived as a trademark any more than "the" or "company." *See Sorensen*, 792 F.3d at 724 (holding "Inhibitor" was not used as a trademark because of "the word's small size, plain color, and non-privileged placement on the bottle" of the product); *see also Wonder Labs, Inc. v. Procter & Gamble Co.*, 728 F. Supp. 1058, 1064 (S.D.N.Y. 1990) (finding "the" in "the dentists' choice" supported defendant's use of the phrase in advertising was not a trademark use). And as the

---

[2] Gatorade disputes that SportFuel owns valid trademarks, but assumed the marks and registrations were valid for purposes of its Motion. (*See* Dkt. 74 at 8, n.2.)

District Court correctly noted, it is never used on product packaging. (A-11; Dkt. 59 ¶ 26.)

The prominence of GATORADE in the slogan further supports that Gatorade is the sole source identifier in the slogan. *See Packman*, 267 F.3d at 640 ("The Tribune's use of its well-known masthead also identifies the phrase as a newspaper headline reporting on an event, and not as a Tribune trademark."). Similarly, in *B & L Sales Assocs. v. H. Daroff & Sons, Inc.*, 421 F.2d 352 (2d Cir. 1970), the defendant used the slogan "Come on Strong" (identical to the plaintiff's registered mark) in large, block letters in the upper-left corner of advertisements for its Botany 500-branded clothing. *See id.* at 353. Underneath in somewhat smaller print, it said "with Botany 500." *Id.* The advertisements also showed an image of a male model in a suit, with "Botany 500" at the bottom of the advertisement, followed by "tailored by Daroff." The advertisement appeared in store displays, posters, and national advertisements. *See id.* at 353. Because of the appearance of the advertisement as a whole, the court concluded it was "inconceivable that these materials were intended to attribute the source of the goods to anyone other than defendant Daroff," and was "quite obvious that the phrase 'Come on Strong' was intended only to describe the manner in which Botany 500 clothing would assist the purchaser in projecting a commanding, confident, 'strong' image to his friends and admirers." *Id.* Thus, even if using the GATORADE mark does not mean *per se* that "sports fuel" is not used as a trademark, the overall appearance of the slogan shows that this term is being used descriptively.

Because of the appearance of the slogan, this case is easily distinguishable from *Sands, Taylor & Wood Co. v. The Quaker Oats Co.*, 978 F.2d 947 (7th Cir. 1992). In *Sands, Taylor*, the Seventh Circuit upheld the district court's finding that "Thirst Aid," in "Gatorade is Thirst Aid" was used as a trademark by the defendant because (1) "Thirst Aid" was an "attention-getting symbol," as it appeared more prominently and in larger type than "Gatorade," and (2) "given the rhyming quality of "Gatorade" and 'Thirst Aid,' the association between the two terms created by Quaker's ads is likely to be very strong . . . ." 978 F.2d at 954.

Neither of these facts are present in this case. "Gatorade" is always more prominent by being the only word in bold text, and it is never smaller than "sports fuel." (*See* Dkt. 59 ¶ 17.) Further, "sports fuel" does not rhyme with "Gatorade." Unlike "Thirst-Aid," there are also a number of third party uses of "sports fuel," further precluding any association. (*See* Dkt. 61-1/61-2 at 131:17-19, 169:24-170:10, 177:1-4, Exs. 6, 14, 16, 17 at 3, 26-27, 29, 30, 34 at 133, 39; Dkt. 61-22; Dkts. 61-23–26.) The District Court correctly distinguished *Sands, Taylor* (A-8–11), and this Court should as well. *See, e.g.*, *Packman*, 267 F.3d at 640 (distinguishing *Sands, Taylor* because "[i]ntegral to the court's conclusion was evidence that 'Thirst Aid' appeared more prominently than 'Gatorade' in the advertisements and that the rhyming quality of the two words created a 'memorable slogan' . . . ."); *Ciociola v. Harley-Davidson Inc.*, 552 F. Supp. 2d 845, 861 (E.D. Wis. 2008), as amended (May 28, 2008) (adopting *Packman's* differentiation of *Sands, Taylor* in finding defendant's use of "Scarecrow" in a paint name and in close proximity to "Harley-

Davidson" on a painted motorcycle gas tank was fair use against plaintiff's "Scarecrow" trademark for motorcycle painting and detailing services).[3]

In an attempt to overcome the undisputed evidence showing Gatorade, and not "sports fuel," is the sole indication of source, SportFuel dissects how a display and a portion of a single webpage appear, and it misconstrues testimony from Gatorade's Chief Marketing Officer. (*See* Brief 25, 35–37.)

In the display shown below, Gatorade is the unmistakable indication of source.



---

[3] *See also Scandaglia v. TransUnion Interactive, Inc.*, No. 09 C 2121, 2010 WL 3526653, at *4–6 (N.D. Ill. Sept. 1, 2010) (distinguishing *Sands, Taylor* and finding defendant's use of "always know where you stand" was fair use); *Bell v. Harley Davidson Motor Co.*, 539 F. Supp. 2d 1249, 1260–61 (S.D. Cal. 2008) (distinguishing *Sands, Taylor* and granting summary judgment for defendant on its fair use defense in reverse confusion case where both parties used "ride hard" for clothing and other merchandise).

(Dkt. 61-13 at GAT0000374.) "Gatorade" is the most prominent word. The side of the display is dominated by Gatorade's G-Bolt Mark, as are the product packages. Like "Protein" and "Carbs," "The Sports Fuel Company," is non-stylized and noticeably smaller than Gatorade and the G-Bolt. This signals the terms simply provide information about what the display contains and the type of company Gatorade is. Taken as a whole, Gatorade, and not "sports fuel" (or "Protein" or "Carbs"), is the indication of source.

The same is true in the partial image of a Gatorade webpage focused on by SportFuel. (*See* Brief 34.) As shown below, viewing the entirety of the webpage eliminates any perceived emphasis of "sports fuel."







Gatorade: The Future of Sports Fuel



https://www.gatorade.com/beTAB[1/12/2017 10:04:50 AM]

Gatorade: The Future of Sports Fuel



https://www.gatorade.com/beTAB[1/12/2017 10:04:50 AM]

Gatorade: The Future of Sports Fuel



https://www.gatorade.com/beTAB[1/12/2017 10:04:50 AM]

(Dkt. 69 ¶ 9; Dkt. 69-8.) "Sports fuel" is surrounded by words of the same size and prominence and used as part of a sentence. "Gatorade" appears as the indication of source, including in the domain name, at the top of the webpage, and in the

21

copyright notice at the bottom of the webpage. Again, this shows Gatorade is the sole indication of source. *See B & L Sales Assocs.*, 421 F.2d at 353; *Arnold v. ABC, Inc.*, No. 06 Civ. 1747, 2007 WL 210330, at *3, n.6 (S.D.N.Y. Jan. 29, 2007) (dismissing complaint under fair use doctrine, noting any consumer seeing the phrase "WHAT'S YOUR PROBLEM" on ABC's website would see ABC's trademarks, making it "obvious" to any consumer that the show's source is ABC, not the plaintiff). The sporadic use of "sports fuel" in text larger than *some* uses of "Gatorade" does not make it an indication of source. *See Eli Lilly & Co. v. Revlon, Inc.*, 577 F. Supp. 477, 486 (S.D.N.Y. 1983) ("Although Revlon has printed the words 'lip repair cream' in large letters, those words do not indicate the origin of the product. The identification function is served by the European Collagen Complex trademark and the Revlon name, even though these are in smaller print.").

Finally, Gatorade's Chief Marketing Officer (a non-lawyer), simply testified: "I think . . . the *combination* of Gatorade – The Sports Fuel Company is a trademark." (Dkt. 78.1 at 61:23-62:1 (emphasis added).) As the District Court concluded (A-5), this testimony does not create an issue of fact as to whether Gatorade actually uses "sports fuel" as a trademark.

ii.     Gatorade Disclaimed Exclusive Rights to "The Sports
        <u>Fuel Company"</u>

SportFuel argues whether "sports fuel" is used as a trademark is determined by whether Gatorade intended to use it as a trademark. (*See* Brief 26.) Yet, in *M.B.H. Enters.* (on which the case SportFuel cites to relied), the court made clear its analysis depended on the other two fair-use factors: "the only real issues here

involve WOKY's good faith and the descriptiveness of the slogans." *M.B.H. Enters.*, 633 F.2d at 53. It therefore evaluated the defendant's intent only in connection with the good faith factor, not to determine if the phrases at issue were used as trademarks. *See id.* at 54.

Regardless, SportFuel's arguments that the registration for "Gatorade The Sports Fuel Company" shows Gatorade uses "sports fuel" as a trademark are unfounded. Gatorade voluntarily disclaimed exclusive ownership rights to the phrase "The Sports Fuel Company" on the face of its publicly available registration. (*See* Dkt. 61-13 at GAT0000268; *see also supra* p. 15.)

The occasional use of a "TM" symbol at the end of the slogan, which contains the GATORADE mark, also does not mean "sports fuel" is used as a trademark. *See In re Nosler Bullets, Inc.*, 169 U.S.P.Q. 62, 1971 WL 16439, at *1 (TTAB 1971) (noting consumers will see PARTITION as the descriptive name of a product despite use of the "TM" symbol because of the consistent use of its house mark); *cf. In re Remington Products Inc.*, 3 U.S.P.Q.2d 1714, 1987 WL 124304, at *1–2 (TTAB 1987) (upholding refusal to register "PROUDLY MADE IN USA" because there was no evidence consumers recognized it as a source indicator, even though "TM" symbol was used).

### iii. The Fair Use Defense Applies to Descriptive Terms

SportFuel's argument that "sports fuel" is capable of gaining secondary meaning such that it must now be found to be used as a trademark should be rejected. If it were true that the fair use defense could not apply to any term that could gain

secondary meaning, the application of the defense would be limited to generic terms.[4] The Lanham Act, however, does not contain this limitation. *See* 15 U.S.C. § 1115(b)(4). Adopting SportFuel's argument would add a restriction to the fair use defense that would dramatically limit its availability.

Additionally, SportFuel's arguments regarding secondary meaning presume a term is being used a trademark. A term cannot gain secondary meaning if it is not used as a trademark. *Cf. Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387, 394 (7th Cir. 1992) ("Secondary meaning is 'a mental association in buyers' minds between the alleged mark and a single source of the product." (quoting 1 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 15:2 (2d ed. 1984)). And third-party use can prevent secondary meaning from developing. *See id.* at 393. Moreover, some terms are so highly descriptive that they can never gain secondary meaning. For example, a laudatory slogan can be incapable of serving as a trademark. *See In re Boston Beer Co.*, 198 F.3d 1370, 1373–74 (Fed. Cir. 1999) (holding "The Best Beer in America" incapable of registration as a slogan because it was so highly laudatory and descriptive it could not acquire distinctiveness as a trademark).

---

[4] Generic terms can never be trademarks. *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 609 (7th Cir. 1986) ("Imagine being forbidden to describe a Chevrolet as a 'car' or an 'automobile' because Ford or Chrysler or Volvo had trademarked these generic words . . . .).

### c. Gatorade Uses "Sports Fuel" Fairly and in Good Faith

#### i. Gatorade's Descriptive Use of "Sports Fuel" and Its Prominent Use of GATORADE® and the G-Bolt Mark Show Good Faith

Gatorade uses the descriptive term "sports fuel" because it believes this term fairly describes its products. It has used "sports fuel" internally since at least 2012 to refer to its products that are specifically designed to help improve performance in sports activities, and it has described other parties' products as sports fuel products. (*See* Dkt. 59 ¶¶ 10, 13; Dkt. 61-8 at 1–2, 4; Dkt. 61-9 at 1; Dkt. 61-10 at 1–2; Dkt. 61-11 at GAT_0001968; Dkt. 61-12 at GAT_0011822.) Moreover, its use is consistent with the descriptive use by others in the industry. (*See, e.g.*, Dkt. 61-1/61-2 at Exs. 6, 14, 16, 49, 52.)

Additionally, Gatorade conveys the source of its products by emphasizing GATORADE and its G-Bolt Mark through large and bolded text, as well as distinct design elements in the G-Bolt Mark. (*See* Dkt. 59 ¶¶ 25–28.) It does so on product packaging, in advertisements, and on displays. (*See id.*) This consistent and prominent use of its marks also supports it acted in good faith. *See M.B.H. Enters.*, 633 F.2d at 54 (explaining defendant had no intent to confuse its services with those of plaintiff as it identified itself by its call letters and frequency); *see also Int'l Stamp Art, Inc. v. U.S. Postal Serv.*, 456 F.3d 1270, 1275 (11th Cir. 2006) ("The Postal Service has also provided affirmative evidence of good faith in showing that it prominently places its own familiar Eagle trademark on the backs of its stamp art products thereby identifying them as Postal Service products rather than the

products of anyone else in the marketplace."); *Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997) (finding defendant's good faith evidenced by "the prominent display of defendants' own trademarks").

ii.    The Changes to the Fair Use Defense Advocated by <u>SportFuel Have No Justification</u>

In analyzing fair use, the Seventh Circuit has consistently found mere knowledge of a plaintiff's mark is not evidence of bad faith. *See, e.g.*, *Packman*, 267 F.3d at 642; *Sorensen*, 792 F.3d at 725. This is consistent with the purpose of the fair use defense. Forcing parties who wish to use a term descriptively to first conduct trademark clearance searches, contact trademark owners to "see if an amicable resolution could be reached" (Brief 15, 17), or other similar obligations would place an unwarranted burden on parties exercising their statutory rights. *Cf. Sorensen*, 792 F.3d at 725 (explaining failure to conduct trademark search was not evidence of bad faith where defendant believed it was using the term descriptively and was already aware of plaintiff's mark); *Car-Freshner Corp.*, 70 F.3d at 270 ("As [defendant] was fully entitled to use a pine-tree shape descriptively notwithstanding [plaintiff's] use of a tree shape as a mark, the fact that it did so without consulting counsel has no tendency to show bad faith."); 4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:120 (5th ed. 2018) (explaining majority position that bad faith cannot be inferred from failure to cease actions after receipt of cease-and-desist letter).

The Seventh Circuit has also found that using a house mark is not evidence bad faith. *See Packman*, 267 F.3d at 642 ("[T]he presence of the Tribune's distinctive

masthead above 'The joy of six' headline and on each piece of championship memorabilia will not support an inference that the Tribune acted in bad faith."); *see also supra* p. 25. Holding otherwise would effectively prohibit parties from identifying the source of the products or services they are describing, regardless of whether forward or reverse confusion theories were asserted.

SportFuel, however, tries to change both of these rules by incorporating the approaches used by some courts in analyzing the intent factor in the likelihood of confusion test (not fair use). (*See* Brief 18–19.) Neither change should be adopted. As a preliminary matter, in the Seventh Circuit, unlike the cases cited by SportFuel, the intent factor in the likelihood of confusion test is irrelevant under a theory of reverse confusion. *See Sands, Taylor & Wood Co.*, 978 F.2d at 961 (explaining the defendant in a reverse confusion case "by definition is *not* palming off or otherwise attempting to create confusion as to the source of his product."). By arguing this Court should find awareness of the senior user's asserted mark or use of a house mark is evidence of bad faith, SportFuel is advocating for a change in the fair use test that is contrary to the position taken by the Seventh Circuit in the likelihood of confusion context.

Moreover, when analyzing a claim of reverse confusion, the concern is whether a junior user adopting a confusingly similar *mark* will "overwhelm" the senior user. *See Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 701 (7th Cir. 2014). But that concern is not present when the senior user is using a term in its descriptive sense; it cannot overwhelm the senior user when it is not using the term

to identify itself. *Cf. Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 486 (7th Cir. 2007) ("[W]ithout proof of secondary meaning there is no basis for thinking a descriptive mark [is] the name of a brand—no basis therefore for supposing that consumers would think [defendant's] van 'Work and Play' had been produced by [plaintiff] instead."). Similarly, if the term at issue is being used descriptively, then also using a house mark cannot "create" reverse confusion as SportFuel argues. (*See* Brief 19.) Rather, the house mark *is* the source identifier.

Finally, the *Sands, Taylor* decision does not support SportFuel's position. It did not find that use of a house mark is evidence of bad faith in the fair use context. Unlike this case, the court in *Sands, Taylor* did not analyze the good faith factor in the fair use defense; the court's discussion of defendant's use of a house mark was in connection with whether a term was used descriptively or as a mark. *See* 978 F.2d at 954.[5]

      iii.      <u>SportFuel Presented No Evidence of Bad Faith</u>

SportFuel admits it has no evidence Gatorade intended to confuse consumers or push SportFuel out of the market by using the term "sports fuel." (Dkt. 61-1/61-2 at 297:3-21.) Instead, it argues that bad faith exists because the parties had a business relationship—which ended more than 10 years ago. It also argues, for the first time,

---

[5] SportFuel also cited *Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284 (9th Cir. 1992) in support of its argument. But this opinion did not involve a fair use defense, and the Ninth Circuit has found in reverse confusion cases the defendant's use of a house mark distinguishes the parties' marks when applying the likelihood of confusion test. *See, e.g.*, *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 (9th Cir. 2000) (finding defendant's use of BARBIE in connection with "Pearl Beach" indicated the products' origin and distinguished the parties' marks).

that the relationship "soured" in 2003, and Gatorade should have produced more documents regarding a "marketing campaign." (Brief 15–17.)

As explained above (*supra* p. 26), defendant's general knowledge of a plaintiff's marks does not evidence bad faith. SportFuel does not argue how a business relationship that ended between the parties in 2003 amounts to more than mere knowledge of SportFuel.[6] Nor could it. *See Munters Corp. v. Matsui Am., Inc.*, 730 F. Supp. 790, 801 (N.D. Ill. 1989) (rejecting argument that defendant's descriptive use of "honeycomb" in advertisement demonstrated bad faith despite agreement with plaintiff to stop using HONEYCOMB as a mark). Likewise, the fact that Gatorade continued to use "Gatorade The Sports Fuel Company" after learning of SportFuel's challenge is not evidence of bad faith. *See id.*; *see also supra* p. 26.

There is also no basis for inferring bad faith based on how the parties' relationship ended in 2003, especially given that the alleged use began 12 years later. Indeed, the testimony cited by SportFuel does not evidence a soured relationship:

> A. Well, I spoke for Gatorade for many, many years on behalf of SportFuel and Gatorade. I provided -- I have a PowerPoint presentation where it says SportFuel and GSSI or Gatorade many times across the country to various athletic trainers and different groups.
> Q. And that ended in 2003?
> A. I believe so, whenever that last talk was, the golf talk.

---

[6] Additionally, there is no evidence that the individual employees at Gatorade who selected or decided to use "Gatorade The Sports Fuel Company" many years later had any knowledge of SportFuel. (*See* Dkt. 61 ¶ 22.)

(Dkt. 61-1/61-2 at 112:9-112:17.) Moreover, SportFuel waived this argument because it never raised it before the District Court. *See Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992) (refusing to consider due process argument raised for first time on appeal).

The District Court correctly rejected SportFuel's argument that Gatorade acted in bad faith because it did not produce documents approving a "marketing campaign" as mere speculation that cannot create an issue of material fact. (*See* A-15.) "Gatorade The Sports Fuel Company" is just one slogan of many. (*See* Dkt. 61-3 at 114:2-8.) The use of "rebrand" in one of Gatorade's internal marketing presentations simply means that Gatorade would position itself as "THE fueling company that is continually innovating to create sports fuel solutions to help athletes perform their best." (Dkt. 61-12 at GAT_0011821.) The presentation explained that Gatorade is "no longer just a hydration company," but rather that it also provides "sports fuel" products, which differ from "sports nutrition" products because they are specifically designed to help improve athletic performance. (*See id.* at GAT_0011821–22.) Gatorade's intention to better describe its breadth of products is not evidence of bad faith.

*       *       *

Gatorade submitted sworn admissions by SportFuel, testimony by its Chief Marketing Officer, findings by the USPTO and Gatorade's response, internal documents, and advertisements showing Gatorade uses "sports fuel" in good faith to fairly describe the nature of Gatorade's products and the type of company Gatorade

is. After examining this evidence, the District Court correctly found no genuine issue of material fact existed regarding Gatorade's fair use defense. SportFuel has not cited evidence or legal authority overlooked by the District Court warranting a different result.

### d. *KP Permanent Make-Up* Did Not Require the District Court to Analyze the Likelihood of Confusion Factors Before Granting Summary Judgment for Gatorade on Its Fair Use Defense

The defendant in a trademark infringement case asserting an affirmative defense of fair use has *no* burden to negate any likelihood of confusion. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 114, 118–21 (2004). In *KP Permanent Make-Up*, the district court granted summary judgment for the defendant on its fair use defense. *See id.* at 115–16. The Ninth Circuit reversed, believing it was error to consider the fair use defense without examining possible confusion, appearing to have placed the burden on defendant to show the absence of consumer confusion. *See id.* at 116. The Supreme Court vacated the Ninth Circuit's decision. *See id.* at 117. If the defendant has to show there is no likelihood of confusion before the fair use defense can apply, then the defense would be foreclosed in the only situation in which it is relevant. *See id.* at 120. Trademark law does not "deprive commercial speakers of the ordinary utility of descriptive words." *Id.* at 122. Indeed, "'[i]f any confusion results, that is a risk the plaintiff accepted when it decided to identify its product with a mark that uses a well-known descriptive phrase.'" *Id.* (quoting *Cosmetically Sealed Indus., Inc.*, 125 F.3d at 30).

The Supreme Court refused to require courts to consider likelihood of confusion before finding the fair use defense can apply. *See id.* at 123. Its ruling did not

"foreclose" the relevance of the extent of any likelihood of confusion, but it refused to say anything more. *See id.* Therefore, contrary to SportFuel's argument, the District Court did not contravene Supreme Court precedent by not deciding SportFuel's likelihood of confusion claim. Moreover, there is nothing in the Lanham Act requiring a likelihood-of-confusion analysis to be conducted before the fair use defense can apply. *See* 15 U.S.C. 1115(b)(4).

As described in more detail below (*infra* Section 2(b)-(c)), even if SportFuel's likelihood of confusion claim was considered, summary judgment is still appropriate. The uncontested material facts demonstrate there is no likelihood of confusion.

**2. The Court Should Affirm the District Court's Grant of Summary Judgment on the Alternative Ground That There Is No Likelihood of Confusion**

**a. This Court Can Affirm Summary Judgment on an Alternative Ground**

Where the parties have fully briefed an issue, an appellate court can affirm a district court's decision on an alternative ground not decided by the district court. *See Diliberti v. United States*, 817 F.2d 1259, 1262 (7th Cir. 1987); *Gimix, Inc. v. JS & A Grp., Inc.*, 699 F.2d 901, 904–08 (7th Cir. 1983) (upholding summary judgment for defendant on alternative ground that plaintiff's mark was merely descriptive and had not acquired secondary meaning). Remanding the case is wasteful if a district court reached the correct result albeit for different reasons. *See Covenant Media of SC, LLC v. City Of N. Charleston*, 493 F.3d 421, 430–31 (4th Cir. 2007) (affirming summary judgment on alternative grounds). Here, the parties fully briefed the issue of whether Gatorade's use of "Gatorade The Sports Fuel Company"

creates a likelihood of confusion with SportFuel's claimed SPORTFUEL mark. (*See generally* Dkts. 74, 76, 87.) The District Court found this issue moot in light of granting summary judgment for Gatorade on its fair use defense. (*See* A-3.)

The Court should uphold the District Court's grant of summary judgment on the alternative ground "Gatorade The Sports Fuel Company" does not create a likelihood of confusion with SportFuel's claimed SPORTFUEL mark. This Court has the same evidentiary record as the District Court, which establishes that summary judgment is also warranted on this alternative ground. Remanding the case would be to the detriment of the parties, judicial economy, and the interests of justice.

### b. A Likelihood of Confusion Is Not Probable

All of SportFuel's claims in its Complaint (Dkt. 61-33 at 5–11) depend on its allegation that Gatorade's use of "sports fuel" in "Gatorade The Sports Fuel Company" slogan is confusingly similar to SportFuel's claimed SPORTFUEL mark. *See Ziebert Int'l Corp. v. After Mkt. Assocs., Inc.*, 802 F.2d 220, 228 (7th Cir. 1986). In order to prevail on any one of its claims, SportFuel must show Gatorade's actions are likely to cause confusion among consumers. *See Packman*, 267 F.3d at 638. Risk of a likelihood of confusion must be *probable*, not just possible. *Sorensen*, 792 F.3d at 726.

To determine whether a likelihood of confusion exists, the Seventh Circuit considers the following factors: (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any evidence of actual confusion; and (7) the

intent of the defendant to "palm off" its product as that of another. *See id.* at 643 (citation omitted). None of the seven factors alone are dispositive. *See id.*; *see also Top Tobacco, L.P. v. N. Atl. Operating Co.*, No. 06 C 950, 2007 WL 118527, at *6–7 (N.D. Ill. Jan. 4, 2007), *aff'd*, 509 F.3d 380 (7th Cir. 2007) (granting summary judgment for defendant although similarity of products and area and manner of concurrent use weighed in plaintiff's favor); *see also Patterson v. TNA Entm't, LLC*, No. 04-C-0192, 2006 WL 3091136, at *16–20 (E.D. Wis. Oct. 27, 2006) (granting summary judgment for defendant where two factors were neutral in reverse confusion case). SportFuel asserts a theory of "reverse" confusion, so the focus is its own services and supplements, and the intent factor is irrelevant. *See* 6 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:159 (5th ed. 2018); *Sands, Taylor & Wood Co.*, 978 F.2d at 961.

### i. SportFuel's Mark and Gatorade's Slogan Are Not Confusingly Similar

To determine if marks are confusingly similar, they must be considered in their entirety as they appear to consumers. *See Henri's Food Prods. Co. v. Kraft, Inc.*, 717 F.2d 352, 355–56 (7th Cir. 1983) (upholding summary judgment for defendant, agreeing the marks' differences outweighed their similarities when viewed as a whole). "Different packaging, coloring, and labeling can be significant factors in determining whether there is a likelihood of confusion." *Packman*, 267 F.3d at 644 (citations omitted).

As they appear to consumers, the parties' marks are different.



|  | Website | Product packaging |
|---|---|---|
| SportFuel | | |
| Gatorade | | |

(Dkt. 61 ¶¶ 38–41.)

The parties use different words, stylization, and color schemes. (*Compare* Dkt. 59 ¶¶ 25–26, 28, 29 *with* Dkt. 61-1/61-2 at 19:5-7, 83:3-9, 98:23-99:4, Exs. 4, 5, 7-10.) Gatorade never uses the unitary term "SportFuel." (Dkt. 59 ¶ 21.)

Prominent use of Gatorade's well-known GATORADE® and G-Bolt Marks lead consumers to instantly recognize Gatorade's products as being from Gatorade, reducing or eliminating any likelihood of confusion. *See Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir. 2002) (affirming summary judgment for defendant in reverse

confusion case and finding use of house marks distinguished parties' uses of identical slogans); *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir. 1993) (affirming summary judgment for defendant in reverse confusion case and finding parties' marks dissimilar because "[plaintiff's SPORTSTICK] mark appears as one word and is the only identifier of the product" but on defendant's, the words "sport" and "stick" are preceded in larger letters by the well-known brand name "Right Guard."), *abrogated on other grounds by Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39 (2d Cir. 1994). Indeed, this court has found the use of a house mark minimizes the risk of confusion in cases involving an individual or a small company as a plaintiff and a larger defendant. *See Sorensen*, 792 F.3d at 728; *cf. Packman*, 267 F.3d at 643–44. Further, while viewed as whole, distinctive components of marks should be given greater weight than descriptive terms, such as "The Sports Fuel Company." *See Henri's Food Products Co., Inc.*, 717 F.2d at 355–56 (citations omitted).

Gatorade's slogan does not look or sound like the SPORTFUEL mark, and this factor favors Gatorade. *See Packman*, 267 F.3d at 643 (finding the appearance and placement of "the joy of six" by the parties "distinct such that a consumer would not associate one product with the other"); *S Indus., Inc. v. GMI Holdings, Inc.*, No. 96 C 2232, 1998 WL 67627, at *6 (N.D. Ill. Jan. 30, 1998) (granting summary judgment for defendant where both parties used "Stealth," but the marks were not similar because different fonts and coloring were used, and defendant always used "Genie" to identify source or other terms in addition to "Stealth").

ii.    The Parties' Trade Channels Do Not Overlap

If consumers do not encounter parties' products or services in the same trade channels, they are unlikely to believe those products or services emanate from the same source. *See Packman*, 267 F.3d at 646. Here, there is no trade channel in which a consumer can purchase both of the parties' products and services. (*Compare* Dkt. 61-3 at 85:2-86:3, Dkt. 59 ¶ 30 *with* Dkt. 61-1/61-2 at 41:8-16, 59:14-20,165:10-20.)

The parties' advertising channels are also different. Gatorade advertises in a variety of channels. (*See* Dkt. 59 ¶ 32–35.) But other than SportFuel's website, SportFuel's marketing for the entirety of its existence has consisted of word of mouth, several quotes from SportFuel's founder in a couple of magazines and a single article on a Gatorade website (appearing years before Gatorade started using "Gatorade The Sports Fuel Company"). (*See* Dkt. 61-1/61-2 at 24:2-5, 38:10-24, 109:24-110:5, 110:13-14, Ex. 41; Dkt. 61-30.) Both parties having a website or social media page does not create a similarity in marketing channels. *See, e.g., Sorensen*, 792 F.3d at 718–19, 730 (finding parties' goods were not advertised in same channels despite evidence that both parties advertised online); *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011) (explaining shared use of "ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion."). Further, a hope of expanding into a new trade channel does not create a genuine issue of material fact. *See Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 634 (9th Cir. 2005) (granting summary

judgment for defendant in reverse confusion case; mere interest in expansion, with no concrete evidence of plans to do so, was insufficient to create an issue of fact).

If consumers do not encounter the parties' respective goods or services in the same trade channels, a likelihood of confusion can hardly be "probable."

iii.    The Parties' Goods and Services
Are Not Confusingly Similar

Gatorade sells sports drinks, protein products, energy gel, bars, and chews. (*See* Dkt. 59 ¶ 7.)[7] Gatorade's competitors include other parties that sell sports fuel products. (*See* Dkt. 61-8 at 4; Dkt. 61-9 at 1, 3.)

SportFuel, on the other hand, does not compete in this market. (*See* Dkt. 61-8 at 4.) SportFuel's primary business is sports nutrition consulting services. (*See* Dkt. 61-1/61-2 at 11:24-12:8, 26:3-21, 155:24-156:3, Ex. 4 pp. 1–3 (explaining SportFuel offers "personalized performance nutrition" services and assists "clients with goals in weight management, energy management (adrenal and thyroid insufficiency), digestive disorders, food allergies . . . ." on p. 2); Dkt. 61-28 at SF021708; Dkt. 61-29 at SF021711–12.) SportFuel's competitors are other nutritionists, not companies like Gatorade. (*See* Dkt. 61-1/61-2 at 163:14-164:6, Ex. 33 at SF021067.) SportFuel's sales of a few nutritional powders and a vitamin D supplement to its clients are minimal. (*Compare* Dkt. 61-28 *with* Dkt. 61-29.)

No reasonable consumer purchasing expensive nutrition consulting services, and possibly some nutritional supplements in conjunction with those services, from

---

[7] Gatorade's Gx Hydration System is at its core a customized product (and offered only to select Gatorade partners). (*See* Dkt. 59 ¶ 9; Dkt. 61-3 at 51:20-52:21, 55:14-56:18, 67:3-9.)

SportFuel would believe these products are from or associated with Gatorade. *See Poneman v. Nike, Inc.*, 161 F. Supp. 3d 619, 628 (N.D. Ill. 2016) (holding plaintiff's talent scout and sports promoter services and promotional t-shirts not similar to defendants' t-shirts); *Nutri/System, Inc. v. Con–Stan Indus.*, 809 F.2d 601, 606 (9th Cir. 1987) (finding services dissimilar where weight loss centers and weight loss counseling differed in methods, customer groups, and facilities); *Plus Prods. v. Plus Disc. Foods, Inc.*, 722 F.2d 999, 1008 (2d Cir. 1983) (finding bargain food and expensive health food were not so similar as to create likelihood of confusion).

       iv.      SportFuel's High Prices and Health-Conscious Consumers
                    Make Confusion Unlikely

SportFuel's nutritional consulting services cost hundreds to thousands of dollars. (*See* Dkt. 61-1/61-2 at 46:11-22, 47:2-6, 104:9-22, Ex. 5.) Additionally, SportFuel admitted that all but one of its nutritional supplements cost upwards of $50 each. (*See* Dkt. 77-3 Resp. to Int. No. 21.) With these high prices, consumers will exercise care when considering purchasing services or products from SportFuel.[8] *See Allen Bros., Inc. v. AB Foods LLC*, No. 06 C 1269, 2008 WL 345600, at *4 (N.D. Ill. Feb. 6, 2008) (finding consumer-care factor favored defendants where meat products cost at least $49.95 because "'where the cost of the defendant's . . . product is high, the courts assume that purchasers are likely to be more discriminating . . . .'") (quoting *Maxim's Ltd. v. Badonsky*, 772 F.2d 388, 393 (7th Cir. 1985)).

---

[8] Under a theory of reverse confusion claim, the question is whether the senior user's consumers will mistakenly believe the senior user's goods or services originate from the junior user. *See* McCarthy § 32:159.

SportFuel admitted its clients are "health conscious." (Dkt. 61-1/61-2 at 62:9-15,163:11-13.) SportFuel's consumers also include sophisticated professional sports teams and athletes, who have a higher concern of what they are ingesting, e.g., concerns about performance-enhancing drugs, and who SportFuel recommends pay close attention to labels and consult with physicians or nutritionists before consuming goods. (*See* Dkt. 61-1/61-2 at 62:9-15, 75:1-5, 79:5-24.) Accordingly, SportFuel's customers are likely to exercise a high degree of care by making deliberate purchasing decisions, reducing any risk of confusion. *See Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 831 (8th Cir. 1999) (finding degree-of-care factor weighed against confusion because diet-conscious consumers do not carelessly purchase low-fat frozen entrees from grocery stores); *R.J. Corr Naturals, Inc. v. Coca-Cola Co.*, No. 97 C 1059, 1997 WL 223058, at *7 (N.D. Ill. Apr. 29, 1997) (finding degree-of-care factor weighed against confusion; "[h]ealth food consumers are generally considered to take greater care in selecting the foods they consume . . . .").

v.  SportFuel's Mark Is Conceptually
     and Commercially Weak

The weaker a plaintiff's mark, the smaller its scope of protection. *See Ye Olde Tavern Cheese Prod., Inc. v. Planters Peanuts Div., Standard Brands Inc.*, 261 F. Supp. 200, 207 (N.D. Ill. 1966), *aff'd*, 394 F.2d 833 (7th Cir. 1967) ("In a field where there are many trademarks containing similar elements, the owner's protection must be strictly limited to his full registered mark."). Strength of the plaintiff's mark must still be considered in a reverse confusion case. Failing to do so would

create the "perverse" result that a plaintiff owning an unoriginal mark would be more likely to succeed in a reverse confusion case. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 231–32 (3rd Cir. 2000).

The SPORTFUEL mark is conceptually weak. It immediately conveys an idea of the characteristics of SportFuel's sport nutrition consulting services and ancillary nutritional supplements. SportFuel chose "SPORTFUEL" because its founder wanted to continue working with athletes. (*See* Dkt. 61-1/61-2 at 92:7-22.) SportFuel admits the handful of powders it sells can be fuel for the body. (*See id.* at 171:2-22.) Combining two descriptive terms to form one word does not make the mark conceptually strong or non-descriptive. *See Telemed Corp.*, 588 F.2d at 217–18.

The SPORTFUEL mark is commercially weak as well. "The registration of a mark is not itself evidence of mark strength; rather, strength is created by the extensive use and significant expenditure of a mark holder on advertising and promotion." *Tsiolis v. Interscope Records, Inc.*, 946 F. Supp. 1344, 1355 (N.D. Ill. 1996). Duration of use is not enough to show strength. *See Allen Bros., Inc.*, 2008 WL 345600, at *5 (finding plaintiff had presented no evidence showing consumers identified the plaintiff's products with the claimed "AB" mark, despite 20 years of use). SportFuel's sales are low, and it has never purchased an advertisement for services or products offered by SportFuel since its formation in 1993. (*See* Dkt. 61-1/61-2 at 109:24-110:5, Ex. 41; Dkt. 61-30.) These facts establish SportFuel's mark

is commercially weak. *See World Wide Sales, Inc. v. Church & Dwight Co., Inc.*, No 08 C 1198, 2009 WL 3765881, at *7 (N.D. Ill. Nov. 9, 2009).

Additionally, third parties use "SPORTS FUEL" and "FUEL" in connection with products similar to those offered by SportFuel, including the identical **SPORTFUEL** mark for a protein powder. (*See, e.g.*, Dkt. 61-1/61-2 at 131:17-19, 156:7-14, Exs. 26-27, 29-30, 39; Dkt. 61-25; Dkt. 61-26.) And SportFuel has no objection to uses of "fuel." (*See id.* at 69:11-23, 94:11-95:5, 95:14-19, 97:9-13, 100:11-14, Exs. 6, 14–19, 21.) As a result, consumers are not likely to associate "sports fuel" uniquely with any one party, let alone Gatorade. *See Echo Drain v. Newsted*, 307 F. Supp. 2d 1116, 1124–25 (C.D. Cal. 2003) (finding strength-of-mark factor favored defendants in reverse confusion case where plaintiff's mark was presumptively weak and third parties used the word "echo"); *Noasha LLC v. Nordic Grp. of Cos.*, 630 F. Supp. 2d 544, 556 (E.D. Pa. 2009) (granting summary judgment for defendant in reverse confusion case; the multiple uses of "War" for toys or games lessened a likelihood of confusion).

SportFuel, whose fundamental business is nutrition consulting services, admitted it has no evidence of any harm suffered. (*See* Dkt. 61-1/61-2 at 118:2-7; 118:13-15, 303:18-304:10.) These facts further distinguish this case from *Sands, Taylor*, where the plaintiff proved it lost its ability to commence use of its THIRST-AID mark in connection with a sports drink it had tested and planned to launch through a licensee. *See Sands, Taylor & Wood v. Quaker Oats Co.*, No. 84 C 8075, 1990 WL 251914, at *4, *15 (N.D. Ill. Dec. 20, 1990), *aff'd in part, rev'd in part sub*

*nom.*, *Sands, Taylor*, 978 F.2d 947. Additionally, unlike this case, the plaintiff actively enforced its mark, the parties' marks as actually used in the marketplace appeared similar (e.g., similar font styles), and the parties' products would be available in the same channels of trade. *See id.* at *5; *Sands, Taylor*, 978 F.2d at 960.

### vi.    The Intent Factor Is Irrelevant

This factor is irrelevant in reverse confusion cases. *See World Wide Sales, Inc.*, 2009 WL 3765881 at *7 (*quoting Sands, Taylor*, 978 F.2d at 961). In accordance with the Seventh Circuit's rationale for this factor, Gatorade is a famous brand with decades of success and has no reason to pass off its products as coming from SportFuel. *See Tsiolis*, 946 F. Supp. at 1354 (remarking it was "irrational" that defendants, who had massive prior successes, would intend to "palm off" plaintiff's mark). Indeed, SportFuel admits it has no evidence Gatorade attempted to confuse consumers or push SportFuel out of business. (*See* Dkt. 61-1/61-2 at 297:3-21; *see also supra* Section 1(c)(i).)

### vii.    There Is No Evidence of Actual Confusion

Gatorade has used "Gatorade The Sports Fuel Company" since 2015, but neither party has identified a single instance of actual confusion. (*See* Dkt. 61-7 at Supp. Resp. Nos. 7, 12; Dkt. 59 ¶¶ 19, 36; Dkt. 61-1/61-2 at 112:22-113:7.) Even if 3,600 Internet users searched Google for "sports fuel" each month (according to SportFuel, Dkt. 76 at 8), this simply demonstrates there has been ample opportunity for confusion to manifest if any existed. This weighs in Gatorade's favor. *See Libman Co. v. Vining Indus., Inc.*, 69 F.3d 1360, 1361 (7th Cir. 1995) (pointing out plaintiff's

failure to find any instance of actual confusion despite several hundred thousand sales of the allegedly infringing product); *see also Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 173 (5th Cir. 1986) (finding 17 months of coexistence with no incidents of actual confusion "highly significant").

No instances of actual confusion underscores that it is not probable a reasonable consumer would mistakenly believe SportFuel's nutritional consulting services or supplements are associated with Gatorade.

### c. SportFuel's Surveys Do Not Create a Genuine Issue of Material Fact

SportFuel's purported reverse confusion surveys are unreliable and irrelevant. Neither survey bears any resemblance to marketplace conditions or surveys the proper universe. Mr. Hollander's survey used an improper control and a leading question. Mr. Berger's survey was not designed to measure confusion. These fundamental flaws warrant exclusion of the surveys. Even if admitted, the surveys could not create a genuine issue of material fact as to likelihood of confusion given the minimal weight to which they are entitled. *See Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 394 (7th Cir. 1992) (admitting survey on secondary meaning but finding flaws reduced value of survey to a "mere scintilla" and upheld summary judgment for defendant).

Expert testimony is admissible only if it is based on sufficient facts or data, is the product of reliable principles and methods, and the expert reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. As the "gate keeper," judges determine "whether proffered expert testimony is reliable and relevant before accepting a witness as an expert." *Daubert v. Merrell Dow Pharm.,*

*Inc.*, 509 U.S. 579, 597 (1993). Relevant evidence may be excluded if the danger of unfair prejudice, confusing the issues, or misleading the trier of fact substantially outweighs its probative value. Fed. R. Evid. 403.

A survey is not admissible unless it complies with the principles of professional survey research. *Evory v. RJM Acquisitions Funding L.L.C.*, 505 F.3d 769, 776 (7th Cir. 2007) (collecting cases). A consumer survey must consist of non-leading questions presented to an appropriate "universe" of respondents, and the survey should replicate the "thought processes of consumers encountering the disputed mark or marks as they would in the marketplace." *Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1038 (S.D. Ind. 2000) (collecting cases). Because the experts' surveys purport to survey reverse confusion (Dkt. 69-7 ¶ 14; Dkt. 65-7 at 7), a reliable survey must survey SportFuel's prospective customers. *See* McCarthy § 32:159.

### i. Mr. Hollander's Survey Is Unreliable and Irrelevant

Mr. Hollander showed respondents a partial image of a Gatorade webpage for products in development and the Gatorade Gx Hydration System—which is not only in beta testing, but is available only to select professional athletes—and then partial images of homepages from SportFuel's website and two purported controls. (*See* Dkt. 69-7 ¶¶ 11, 12, 19, 30–37, Exs. 2, 4; Dkt. 67 ¶ 6.) He surveyed any respondent who had exercised or tried a diet once in the past three months and planned to do so again in the next three months. (*See* Dkt. 69-7 ¶ 17.)

(1)     Mr. Hollander Did Not Survey the Proper Universe

Whether the proper universe was surveyed is one of the most important factors in determining the reliability of a survey. *See Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 452 F. Supp. 2d 772, 781 (W.D. Mich. 2006) (excluding survey). To be valid, "'the persons interviewed must adequately represent the opinions which are relevant to the litigation.'" *In re Fluidmaster, Inc.*, No. 14-cv-5696, 2017 WL 1196990, at *29 (N.D. Ill. Mar. 31, 2017) (quoting *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 487 (5th Cir. 2004)).

Mr. Hollander did not survey the proper universe. (*See* Dkt. 69-7 ¶¶ 14, 17, 23–24.) SportFuel's overwhelming source of income is from its nutrition consulting services (*compare* Dkt. 61-28 *with* Dkt. 61-29), and thus the proper universe should consist primarily of potential clients willing to pay hundreds of dollars and invest the time into finding and working with a nutritionist. By failing to limit the respondents to this universe, Mr. Hollander did not isolate potential purchasers of SportFuel—the only opinions that matter in this case.[9] *See Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 631–32 (S.D.N.Y. 2007) (finding screening for respondents who were likely to purchase a handbag costing more than $100 "did little to assure that [the expert] got the right consumers for the survey" when most handbags at issue exceeded $100). This makes his survey both unreliable and irrelevant to the issues in this case.

---

[9] The survey was under-inclusive as well; SportFuel's customers include athletic teams and other entities (*see* Dkts. 69-3, 69-4), but only individuals were surveyed. (*See* Dkt. 69-7 ¶¶ 15, 16.)

(2)　　Mr. Hollander's Survey Failed to Approximate
Actual Marketplace Conditions

The Lanham Act protects consumers from confusion in the *marketplace*, not in

the abstract. *See J.T. Colby & Co., Inc. v. Apple Inc.*, No. 11 Civ. 4060, 2013 WL

1903883, at *20 (S.D.N.Y. May 8, 2013). So, to be reliable and helpful to the trier of

fact, the survey format must mirror the marketplace conditions encountered by

SportFuel's potential consumers when making a purchasing decision. *See Black &*

*Decker Corp. v. Positec USA Inc.*, No. 11-cv-5426, 2017 WL 4010922, at *5 (N.D. Ill.

Sept. 11, 2017) (holding admission of Mr. Berger's survey was fundamentally

unfair).

Mr. Hollander showed different stimuli in sequence, but there is no evidence in

the record showing consumers deciding whether to engage SportFuel's services

would view the partial Gatorade webpage shortly before seeing SportFuel's

homepage. Thus, the survey did not replicate marketplace conditions. *See THOIP v.*

*Walt Disney Co.*, 690 F. Supp. 2d 218, 237–238 (S.D.N.Y. 2010) ("there is not a

reasonable likelihood that consumers would have encountered in close proximity

[plaintiff's products] and [defendant's], let alone those pairs specifically tested . . .

."). Additionally, viewing websites without having to sort through search results

distorts the actual marketplace experience and "exaggerate[s] any confusion that

might be detected." *Simon Prop. Grp. L.P.*, 104 F. Supp. 2d at 1044. The survey

amounted to little more than a "memory test." *Leelanau Wine Cellars, Ltd.*, 452 F.

Supp. 2d at 784 (quoting *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 297 (2d Cir.

1999)) (excluding survey).

Moreover, Mr. Hollander used partial webpages that withheld critical information available in actual marketplace conditions. This included the domain names of the webpages, descriptive uses of "fuel," and the "About" pages of the companies. (*Compare* Dkt. 69-7 at Ex. 4 *with* Dkt. 69 ¶¶ 9, 11–14, Dkt. 69-8; 69-10 ("[w]e believe fueling our body with the proper variety and portion of foods . . . ."); Dkt. 69-11; Dkt. 69-12; Dkt. 69-13.) This further shows the unreliability of Mr. Hollander's survey. *See Simon Prop. Grp. L.P.*, 104 F. Supp. 2d at 1043 (describing a survey where consumers viewed only homepages as "nothing more than a meaningless memory game or word association exercise that bears no relationship to the marketplace."); *Coherent, Inc. v. Coherent Techs., Inc.*, 935 F.2d 1122, 1126 (10th Cir. 1991) (explaining market conditions were not replicated where respondents were not given information typically provided in actual advertising).

(3)     Mr. Hollander's Survey Lacked a Proper Control

A control estimates the degree of "noise" or "error" in a survey. *See Simon Prop. Grp. L.P.*, 104 F. Supp. 2d at 1046. It should "share[ ] as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed." (Dkt. 69-14 at 399.)

Mr. Hollander's controls did not. Consumers viewed Gatorade's partial webpage—a company who offers well-known sports drinks—SportFuel's partial webpage with athletes in the background, and two other partial webpages for Forbes Nutritional Service and Professional Nutrition that had nothing to do with sports, athletes, or fueling for sporting events. (*See* Dkt. 69-7 at Ex. 4.) The purported controls were too dissimilar to SPORTFUEL and "Gatorade The Sports

Fuel Company" to be proper. *See Nabisco v. Warner-Lambert Co.*, 32 F. Supp. 2d 690, 700 (S.D.N.Y. 1999), *aff'd sub nom. Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43 (2d Cir. 2000) (explaining control in Trident gum survey was improper because it did not capture "the essence of the allegedly confusing quality at issue, namely the 'Ice' term or some variation of that theme."); *Vista Food Exchange, Inc. v. Vistar Corp.*, No. 03-CV-5203, 2005 WL 2371958, at *6 (E.D.N.Y. Sept. 27, 2005) ("None of the other names on the list with Vistar even remotely resemble 'Vistar' or 'Vista' and therefore the survey improperly guides participants to chose [*sic*] 'Vistar'"). As a result, rather than isolating legally relevant confusion, the controls chosen by Mr. Hollander artificially increased the probability his survey would show purported confusion. (*See, e.g.*, Dkt. 69-15 at cells AV-4463 ("since both of these are sports related I thought it would only make sense but i am not 100% sure"), AV-3287 ("it sounded right because sports were seen on each ad").)

>        (4)     Mr. Hollander's Survey Relied on a Leading and
>                Suggestive Question

Simply asking certain questions can create the impression of a connection in the minds of respondents that they would have not made on their own. *See Kargo Glob., Inc. v. Advance Publishers, Inc.*, No. 06 Civ. 550, 2007 WL 2258688, at *8 (S.D.N.Y. Aug. 6, 2007).

The key question in Mr. Hollander's survey asked: "Which of the brands you saw on the second set of screen shots, if any, are sponsored by or got permission from the company you saw on the first screen shot [Gatorade] . . . ?" (Dkt. 69-7 ¶ 36.) This led the respondents to wonder why they would be asked whether one of the three

companies got permission from or were sponsored by, if none had been. *See*

*Powerhouse Marks LLC v. Chi Hsin Impex, Inc.*, No. 04-73923, 2006 WL 897254, at

*2 (E.D. Mich. Apr. 5, 2006) (finding Mr. Berger's question "[w]hich, if any,

equipment brand that you see in this room do you believe is sponsored by, licensed

by or associated with a particular fitness center . . . .?" leading); *M.D. On-Line, Inc.*

*v. WebMD Corp.*, No. 05-CV-4081, 2005 WL 2469668, at *6–7 (D.N.J. Oct. 6, 2005)

(holding Mr. Hollander's survey was entitled to little if any weight where he asked

questions including "do you think that these two companies are associated with

each other . . . ?"). In fact, every single respondent believed Gatorade sponsored one

of the three companies shown, further evidencing the leading nature of the

question. (*See* Dkt. 69-7 at 13.) Thus, Mr. Hollander's survey should be excluded.

     ii.     <u>Mr. Berger's Survey Is Unreliable and Irrelevant</u>

     (1)     Mr. Berger Did Not Survey the Proper Universe

Mr. Berger used the identical screening question as Mr. Hollander. (*Compare*

Dkt. 69-7 ¶ 17 *with* Dkt. 65-7 at 2.) Thus, for the same reasons explained above, Mr.

Berger's survey should be excluded. (*See supra* Section 2(c)(i)(1).)

     (2)     Mr. Berger Did Not Use a Recognized Methodology
                    or Replicate Marketplace Conditions

Mr. Berger did not use either of the two recognized formats for likelihood of

confusion surveys. Instead, he opted for a flawed, fill-in-the-blank method where

respondents were asked to fill in the blanks for slogans such as "Like a Good

Neighbor, _____ Is There." and "_____ The Sports Fuel Company." (Dkt. 65-7 ¶¶ 16–

18, Ex. B at 2–4.) Mr. Berger claimed to be following a survey used in *Sands,*

*Taylor*, but purported to investigate reverse confusion, and in doing so, did not even show the survey respondents SportFuel's claimed mark. (*See id.* at ¶ 1.) As Mr. Berger should know, the use of this format warrants excluding the survey. *See Native Am. Arts, Inc. v. Bud K World Wide, Inc.*, No. 7:10-CV-124, 2012 WL 1833877, at *7 (M.D. Ga. May 18, 2012) ("The Court finds that Berger's failure to present the complete manner in which Defendant displays, offers to sell, or sells its goods renders the survey unreliable under Rule 702 and misleading and confusing under Rule 403."); *cf. Black & Decker Corp.*, 2017 WL 4010922, at *4–5 (ordering new trial where Mr. Berger did not test for the "relevant issue" of whether defendant's mark was likely to cause consumer confusion). Other courts have rejected similar fill-in-the-blank surveys as evidence of actual confusion because "[n]o aspect of the study actually tested whether randomly chosen survey participants were confused." *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 799 (6th Cir. 2004); *see also Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001) (excluding survey asking questions about respondents' familiarity with a line of clothing as irrelevant because it did not test for confusion).

Mr. Berger's survey is irrelevant to whether a likelihood of confusion exists. Indeed, if simple awareness of the defendant's mark constituted confusion in a reverse confusion case, there would be no need to apply the likelihood of confusion factors.

        (3)     Mr. Berger's Survey Did Not Include a Control

Mr. Berger's survey did not utilize a control. (*See* Dkt. 65-8 ¶ 40.) As Professor McCarthy warned, "[c]aution must be exercised in evaluating the results of some

open-ended survey questions about brands because respondents who merely guess will likely just play back the names of the best-known and dominant brands." McCarthy § 32:172. Respondents who had never seen the "____ The Sports Fuel Company" could have simply guessed "Gatorade" because Gatorade's *sports* drinks are well known. (*See* Dkt. 61-1/61-2 at 89:2-7.) This is not evidence of confusion. *See Louis Vuitton Malletier*, 525 F. Supp. 2d at 597 ("we have no way of knowing how many respondents named Louis Vuitton because, as one respondent put it, this was the 'only flashy brand that I could think of off hand.'").

Mr. Berger did not ask why respondents answered "Gatorade." (*See* Dkt. 65-7 at Ex. B.) There is no way of determining how deeply the results were affected by irrelevant responses, further undermining any utility of the survey. *See Sears, Roebuck & Co. v. Menard, Inc.*, No. 01 C 9843, 2003 WL 168642, at *3 (N.D. Ill. Jan. 24, 2003) (finding failure to ask why respondents believed Sears and Menard's were affiliated where both used "WHERE ELSE?" in slogans supported exclusion of survey).

*       *       *

Both surveys were so poorly conducted that they are unreliable, irrelevant to the issues in this case, and entitled to little or no weight. Neither create an issue of fact warranting trial in this case.

### 3.  <u>SportFuel Waived All Issues Concerning Any Other Use of "Sports Fuel"</u>

In its Motion, Gatorade showed why (1) the Prime Drink did not create a likelihood of confusion with SportFuel's claimed mark and, in the alternative, (2)

the use of "Sports Fuel Drink" as a descriptor on the Prime Drink was a fair use. (*See, e.g.*, Dkt. 74 at 1, 8, 9, 11, 16, 19, 32–35.) Gatorade met its burden of proof on both points.

SportFuel argues for the first time on appeal that "sports fuel" as used on the Gatorade Prime® Sports Fuel Drink (the "Prime Drink") is not a fair use. (*See* Brief 36.) As the District Court pointed out (A-2, n.1), SportFuel's opposition to Gatorade's Motion explicitly referred to the "slogan" or "marketing campaign," not the Prime Drink or any other uses of "sports fuel." (*See, e.g.*, Dkt. 76 at 32 ("'Sports Fuel' slogan," 34 ("clearly indicating the slogan . . . .") 35 ("'Sports Fuel' marketing campaign").)

The Seventh Circuit has "long refused to consider arguments that were not presented to the district court in response to summary judgment motions." *Cooper*, 969 F.2d at 371 (refusing to consider due process argument raised for first time on appeal). If an argument is not made in response to a summary judgment motion, it is waived. *See id.* at 372. Therefore, the Court should not consider SportFuel's attempts to belatedly raise an issue with the Prime Drink on appeal. *See Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 606 (7th Cir. 2012) (finding plaintiff waived indirect discrimination argument by failing to assert the theory in opposition to the defendant's summary judgment motion, despite plaintiff's argument that he raised everything in the L.R. 56.1 statement of facts); *Pond v. Michelin North Am., Inc.*, 183 F.3d 592, 597 (7th Cir. 1999) ("Pond's amended complaint was vague, and though in the federal system of notice pleading complaints need not articulate legal

theories . . . Pond still had the duty to inform the district court of her disparate treatment claim in opposing Michelin's summary judgment motion.").

In the event this Court does consider SportFuel's arguments about the Prime Drink de novo, summary judgment should be granted for Gatorade. For the same reasons as described above, "sports fuel" describes a characteristic of the Prime Drink. (*See supra* Section 2(b).) Moreover, as the package shows, the G-Bolt Mark and GATORADE are the unmistakable indications of source on the product, with Prime® serving as a sub-brand. The plain "sports fuel drink" text operates to describe what the product is and not as a trademark, and it is consistent with descriptors used on other Gatorade Prime® products.



(Dkt. 59 ¶ 41; Dkt. 61 ¶ 42.) In 2013, Gatorade changed the descriptor from "Pre-Game Fuel" to "Sports Fuel Drink" to better telegraph what the product is, and there is no evidence of bad faith. (*See* Dkt. 59 ¶¶ 23–24; Dkt. 61-7 at Supp. Rog Resp. No. 7.) Therefore, the use of "sports fuel" in Gatorade® Prime® Sports Fuel Drink is a fair use.

Alternatively, no reasonable jury could find Gatorade's use of Gatorade Prime®
Sports Fuel Drink creates a likelihood of confusion with SportFuel's marks. In
addition to the reasons described above (*supra* Section 2(b)), there has not been a
single instance of actual confusion since the Prime® Drink was first offered in 2013.
(*See* Dkt. 59 ¶ 40.)

## CONCLUSION

Gatorade respectfully requests that this Court affirm the District Court's grant
of summary judgment for Gatorade on its fair use defense, dismissing all of
SportFuel's claims. In reaching this conclusion, the Court should find the District
Court did not err under *KP Permanent Make-Up* by not analyzing in its written
opinion the parties' arguments on likelihood of confusion, and that SportFuel
waived its arguments regarding any use of "sports fuel" other than in the "Gatorade
The Sports Fuel Company" slogan. As an alternative ground, Gatorade respectfully
requests this Court affirm the District Court's grant of summary judgment for
Gatorade on the ground that no triable issue on likelihood of confusion exists.

Respectfully submitted,

/s/ Floyd A. Mandell

Floyd A. Mandell (1747681)
Julia L. Mazur (6309387)
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
Telephone: (312) 902-5200
floyd.mandell@kattenlaw.com
julia.mazur@kattenlaw.com

*Attorneys for Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1. This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,975 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Microsoft Word 2016 in 12-point Century style font (and 11-point Century style font for footnotes).

Dated: February 20, 2019          /s/ Floyd A. Mandell

*Attorney for Defendants-Appellees*

# CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2019, the Brief of Defendants-Appellees PepsiCo, Inc. and The Gatorade Company was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.

The following are registered CM/ECF users and will be served by the appellate CM/ECF system:

Raymond P. Niro, Jr.
Kyle D. Wallenberg
Niro McAndrews, LLP
200 West Madison Street
Chicago, Illinois 60606

/s/ Floyd A. Mandell

Floyd A. Mandell